**In the Matter of PEIERLS FAMILY INTER VIVOS TRUSTS.**

**No. 13, 2013.**

Supreme Court of Delaware.

Submitted: July 10, 2013.
Decided: Oct. 4, 2013.

---

31. *Trump v. State*, 753 A.2d 963, 967 (Del. 2000).

32. *Id.* at 969.

Peter S. Gordon (argued), Gordon, Fournaris & Mammarella PA, Wilmington, Delaware, for appellant.

Collins J. Seitz (argued), Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

STEELE, Chief Justice:

This Opinion is one of a trilogy of opinions, issued concurrently, addressing issues arising out of Petitions, filed by members of the Peierls family, requesting the Court of Chancery to accept jurisdiction over, and then modify, thirteen (13) trusts created during the period 1953 through 2005. None of these trusts were created or settled under Delaware law, and none were ever administered in Delaware. The Petitioners sought relief under recently-adopted Court of Chancery Rules 100–103, inclusive, which were designed to create an orderly procedure for entertaining petitions to modify a trust. No respondent was named in the Petitions, which the Court of Chancery denied on various grounds, including lack of jurisdiction. The Petitioners appealed to this Court, which appointed Collins J. Seitz, as *amicus curiae* to brief and argue in opposition to the Petitions.[1]

---

1. The Court appreciates Mr. Seitz's service as *amicus curiae,* and commends him for the

This Opinion, in No. 13, 2013, addresses the issues arising out of the five (5) Peierls *inter vivos* trusts. Our opinions in the companion cases, Nos. 11 and 12, 2013, respectively, address the seven (7) Peierls family testamentary trusts and the charitable trust created by Ethel F. Peierls in 1994. For the reasons next discussed, we affirm the judgment of the Court of Chancery.

## I. FACTUAL AND PROCEDURAL HISTORY

Appellants, Brian E. Peierls and E. Jeffrey Peierls are the current beneficiaries of five *inter vivos* trusts that have been classified into three groups. The Vice Chancellor described in ample detail the facts of this case, much of which we summarize below.

### A. The Five *Inter Vivos* Trusts

On January 14, 1953, Brian and Jeffrey's grandmother, Jennie Peierls, settled two trusts. One trust instrument creates and governs each trust (collectively, the "1953 Trust Instruments"). Brian and Jeffrey are each currently the sole beneficiary of their respective trust in the pair.[2] Importantly, the 1953 Trust Instruments explicitly state that "all questions pertaining to

[their] validity, construction, and administration shall be determined in accordance with the laws of the State of New York."[3] The Trust Instruments also grant each trustee the exclusive right to appoint a successor[4] without any geographic limitation.[5] The trustees' commissions are determined under the laws of New York in accordance with the Trust Instruments.[6] For each trust, two individuals and one corporate institution served as initial trustees in accordance with the requirement that there always be three trustees (two individuals and one institution).[7] Consistent with the description used by the Vice Chancellor, we refer to this pair of trusts as the "1953 Trusts."

Ethel F. Peierls settled a third trust on May 24, 1957, and designated two individuals and one corporate institution as the initial trustees.[8] One trust instrument creates and governs the trust (the "1957 Trust Instrument"). Brian and Jeffrey are currently the sole beneficiaries of that trust. Although the 1957 Trust Instrument declares that its "validity and effect [are] determined by the laws of the State of New Jersey,"[9] the trust's situs and administration have been governed by New York law ever since the Superior

---

quality of his presentation, which is in the finest tradition of the Delaware Bar.

**2.** It appears that the Vice Chancellor in his opinion mistakenly referred to Jeffrey as "the sole current beneficiary of the 1953 *Trust*" after describing a *"pair of trusts"* settled in 1953. *In re Peierls Family Inter Vivos Trusts,* 59 A.3d 471, 473–74 (Del.Ch.2012) (emphasis added). The 1953 *Trusts* are two separate trusts, with one settled for the benefit of Brian and the other for the benefit of Jeffrey. *See* App. to Answering Br. at B714, B872.

**3.** App. to Answering Br. at B727, B885.

**4.** *Id.* at B724, B882.

**5.** *Id.*

**6.** *Id.* at B726, B884.

**7.** *Id.* at B723, B881.

**8.** In the same vein as mentioned above, the Vice Chancellor in his opinion below mistakenly described Jeffrey as being the "sole beneficiary of *his* 1957 Trust" and Brian as the "sole beneficiary of *his* 1957 Trust." *In re Peierls Family Inter Vivos Trusts,* 59 A.3d 471, 474 (Del.Ch.2012) (emphasis added). In fact, only *one* trust was settled in 1957 which designated both Brian and Jeffrey as beneficiaries. *See* App. to Answering Br. at B 121–31.

**9.** App. to Answering Br. at B32, B128.

Court of New Jersey exercised jurisdiction over the trust in 2001 and appointed a New York trustee.[10] Consistent with the Vice Chancellor's opinion below, this trust will be referred to as the "1957 Trust."

Edgar S. Peierls settled a final pair of trusts on August 14, 1975, again with two individuals and one corporate institution serving as the initial trustees. One trust instrument creates and governs both trusts (the "1975 Trust Instrument"). Echoing the 1953 Trusts, these trusts are also "governed by, and [their] validity, effect and interpretation determined by the laws of the State of New York." [11] These Trusts similarly reserve to the trustees the right to appoint their successors without any geographic limitation.[12] The 1975 Trust Instrument also looks to the laws of the State of New York to determine the commissions payable to the trustees.[13] Presently, Brian and Jeffrey are each the sole beneficiary of their respective trust. As did the Vice Chancellor, we refer to this pair of trusts as the "1975 Trusts."

Jeffrey and Malcolm A. Moore serve as the individual trustees of each of the 1953 Trusts, the 1957 Trust, and the 1975 Trusts (collectively the "Trusts"). Bank of America, N.A. serves as the corporate trustee of those Trusts, as the successor of United States Trust Company.

### B. The Trust Petitions

The Petitions regarding the *inter vivos* Trusts all request that the Court of Chancery: (1) approve the resignation of the current trustees; (2) confirm the appointment of Northern Trust Company as the sole trustee; (3) determine that Delaware law governs the administration of each Trust; (4) confirm Delaware as the situs for each Trust; (5) reform the trusts' administrative scheme; and (6) accept jurisdiction over the Trusts. The Peierls' Petitions stem from their general frustration with Bank of America's lack of communication and responsiveness regarding the handling of Trust assets. Their decision to swap corporate trustees and retitle Trust assets in the name of Northern Trust is largely motivated by their desire to "change the situs of the trust[s] to Delaware and establish that Delaware law governs the administration of the trusts." [14] Accompanying the Petitions are the resignations of the Trusts' current trustees, all expressly conditioned upon approval by the Court of Chancery. The appointment of Northern Trust as the new corporate trustee is also expressly conditioned upon approval by the Court of Chancery.

Among the changes to the administrative scheme that the Peierls propose, is to extinguish the current three-trustee scheme in favor of one that involves a single institutional trustee acting under the direction of an Investment Direction Adviser and a Trust Protector, both of whom would be individuals. As proposed, Jeffrey would serve as the inaugural Investment Direction Adviser and "[would] hold and exercise the full power to manage the investments of the Trust." [15] Moore would occupy the Trust Protector role, in which he could remove and appoint both the trustees and the Investment Direction Adviser. The creation of these two positions would largely eviscerate the authority and responsibilities of the trustees by

**10.** *Id.* at B32.

**11.** *Id.* at B571.

**12.** *Id.* at B568–69.

**13.** *Id.* at B569.

**14.** *In re Peierls Family Inter Vivos Trusts,* 59 A.3d 471, 474 (Del.Ch.2012)

**15.** *See, e.g.,* 1953 Trusts Pet. Ex. G at 3.

delegating traditional trustee powers to the Investment Decision Advisor and Trust Protector.[16]

## II. STANDARD OF REVIEW

 The Court of Chancery adopted Rules 100 through 103, effective May 1, 2012, in an effort to clarify the procedures to which a party must adhere when filing a consent petition to reform a trust. The Court of Chancery thereby provided a new avenue for petitioners to utilize that court's equitable powers to reform a trust instrument.[17] We review cases involving the Court of Chancery's exercise of its equitable powers for abuse of discretion.[18] However, in doing so, we review the Court of Chancery's legal conclusions *de novo*.[19]

## III. ANALYSIS

The Vice Chancellor correctly found that whether the Court of Chancery could exercise jurisdiction and grant the requested relief depended upon whether Delaware law applied to the Trusts.[20] For this reason we first address the law governing the administration of the Trusts and thereafter evaluate the Vice Chancellor's conclusions on the remaining issues.

### A. Which State's Law Governs the 1953 and 1975 Trusts?

The Appellants' Petitions assume that once a Delaware trustee is appointed and takes custody of Trust assets, Delaware law will govern administration of the Trusts. The Vice Chancellor found, however, that Delaware law could never govern the administration of the *inter vivos* Trusts because that result would be "contrary to the choice of law provisions in the trust agreements."[21] For the reasons outlined below, we find that the Trust Instruments do not necessarily preclude the future application of Delaware law to the Trusts' administration.

#### 1. Choice of Law Principles

When confronted with a choice-of-law issue, Delaware courts adhere to the *Restatement (Second) of Conflict of Laws*.[22] The *Restatement* directs that initially "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law."[23] In the absence of a statutory directive, the *Restatement*

16. In his opinion, the Vice Chancellor describes in ample detail the roles of each new position in the administrative scheme. *See Peierls Family Inter Vivos Trusts*, 59 A.3d at 474–76. We, therefore, need not address these details.

17. App. to Opening Br. at A42 (citing Consent Petition Committee of the Delaware Bar Association, *Report to the Court of Chancery of the State of Delaware on the Matter of Consent Petitions* (Mar. 8, 2010)) ("[Chancery Court's] equitable power ... allows it to reform a trust.").

18. *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 523 (Del.2008); *In re Unfunded Ins. Trust Agreement of Capaldi*, 870 A.2d 493, 497 (Del.2005).

19. *Lawson v. Meconi*, 897 A.2d 740, 743 (Del. 2006). *See also Scion Breckenridge Managing Member, LLC v. ASB Allegiance Estate Fund*, 68 A.3d 665, 675 (Del.2013); *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 37 A.3d 205, 209–10 (Del.2011).

20. *Peierls Family Inter Vivos Trusts*, 59 A.3d at 476 ("The petitions fail primarily because Delaware law does not govern the trusts.").

21. *Id.* at 478.

22. *State Farm Mut. Auto. Ins. Co. v. Patterson*, 7 A.3d 454, 457 (Del.2010); *Liggett Grp., Inc. v. Affiliated FM Ins. Co.*, 788 A.2d 134, 137 (Del.Super.2001); *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del.1991).

23. *Restatement (Second) of Conflict of Laws* § 6 (1971).

outlines several factors to consider when deciding the applicable rule of law.[24]

Delaware has adopted a choice-of-law statute that applies to the administration of a trust.[25] The Peierls assert that 12 *Del. C.* § 3332(b) governs the choice of law in this case.[26] Section 3332(b) states that, "[e]xcept as otherwise expressly provided by the terms of a governing instrument or by court order, the laws of this State shall govern the administration of a trust while the trust is administered in this State."[27] Notably, the statute imposes a precondition upon its application—namely that the trust "[be] administered" in Delaware. The Petitions in part seek orders approving the resignation of the current trustees—resignations that are conditioned on judicial approval—and the appointment of a successor trustee, whose acceptance is also conditioned on judicial approval. Because the current trustees have not actually resigned and the successor trustee has not yet assumed its role, the Trusts are not yet "in Delaware" for purposes of deciding whether to permit a transfer of administration and a change in the law of administration. Accordingly, Section 3332(b) is not yet applicable. We, therefore, must look to our conflict-of-laws jurisprudence to determine whether a Delaware court can exercise jurisdiction over and approve the Peierls' Petitions.

We again turn to the *Restatement* for further clarification of the principles governing a trust instrument's choice-of-law provision and the settlor's intent to allow a change in the trust's governing administrative law.

### i. Which State's Law Governs The Administration Of A Trust?

Section 272 of the *Restatement* specifically addresses which state's law governs the administration of *inter vivos* trusts.[28] Section 272's Comment *a* directs us to Section 271's Comment *a* (which discusses testamentary trusts) to determine what matters are administrative in nature.[29] Administrative matters are "those matters which relate to the management of the trust," including a trustee's powers, the liabilities a trustee may incur for breach of trust, what constitutes a proper investment, a trustee's compensation and indemnity rights, a trust's terminability, and, importantly, a trustee's removal and successor trustees' appointment.[30] We note that the Peierls' Petitions seek to change the existing trustees; declare that Delaware is the Trusts' situs and that Delaware law governs administrative matters; modify the Trusts' provisions to allow for particular management changes under the Delaware trust statutes; and accept jurisdiction over the Trusts. All of these are administrative matters. Accordingly, we must determine which state's law governs the Trusts' administrative provisions to de-

---

**24.** These factors include:
 (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of the other interested states had the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. *Id.* at § 6.

**25.** 12 *Del. C.* § 3332.

**26.** Opening Br. at 21–22.

**27.** 12 *Del. C.* § 3332(b).

**28.** *Restatement (Second) of Conflict of Laws* § 272.

**29.** *Id.* at § 272 cmt. a.

**30.** *Id.*

termine whether the Vice Chancellor properly denied the Petitions.

■ "Generally speaking, a creator of an inter vivos trust has some right of choice in the selection of the jurisdiction, the law of which will govern the administration of the trust." [31] The *Restatement* similarly provides that the law governing a trust's administration is either "the local law of the state designated by the settlor to govern the administration of the trust," or, if the settlor does not designate a particular state's law, "the local law of the state to which the administration of the trust is most substantially related." [32] Thus, different principles apply depending on whether the trustee has designated a particular state's governing law.

■ A settlor may designate, either expressly or implicitly within the trust instrument, the law governing the trust's administration.[33] Where the settlor does not include an express choice-of-law provision, his designation "may otherwise be apparent [*i.e.*, implied] from the language of the trust instrument or from other circumstances, such as the extent of the contacts with a particular state." [34]

■ When, on the other hand, "the settlor does not designate a state whose local law is to govern the administration of the trust," either expressly or implicitly, "the local law of the state to which the [trust's] administration is most substantial-

ly related" will control.[35] Of the several states that potentially may have a substantial relationship with a trust's administration, "most important is the state ... where the settlor manifested an intention that the trust should be administered." [36] Thus, even where the settlor does not identify a particular state's law as the governing administrative law, "[i]f the settlor has manifested an intention that the trust should be administered in a particular state, the local law of that state will be ... the law governing the administration of the trust, unless it appears that the settlor desired to have some other law applied." [37] If no evidence suggests that the settlor intended for a particular state's law to apply, we consider other factors bearing on the "substantial relationship" analysis, such as the settlor's domicile, where the settlor executed and delivered the trust instrument, where the trust assets were located at the trust's inception, and the beneficiaries' domicile.[38]

## ii. Changing the Place of Administration of a Trust and its Effect on the Law Governing Administration of the Trust

■ The *Restatement* provides that normally the trustee of an *inter vivos* trust can "enter upon the performance of his duties without authority from any court, and he is not under a duty to account to

---

31. *Lewis v. Hanson*, 128 A.2d 819, 826 (Del. 1957) (citing *Wilm. Trust III*, 24 A.2d 309 (Del.1942)).

32. *Restatement (Second) of Conflict of Laws* § 272.

33. *Id.* at cmt. c.

34. *Id.; see also Lewis*, 128 A.2d at 826 (inferring choice of law from other circumstances, such as where the settlor signs the trust in-

strument in a particular state and delivers the trust corpus to a trustee doing business in that same state).

35. *Restatement (Second) of Conflict of Laws* § 272 cmt. d.

36. *Id.*

37. *Id.*

38. *Id.*

any particular court." [39] At this point, no court has exercised jurisdiction over the Trusts. Only when a beneficiary or trustee brings a suit over the trust does a court acquire jurisdiction.[40] To be sure, this situation is distinguishable from that in which "the trustee has become subject to the continuing jurisdiction of a particular court to which the trustee is thereafter accountable." [41]

Where the trust is not yet subject to a particular court's oversight, the *Restatement's* comments identify issues that arise when parties seek to change the place of a trust's administration.[42] The key question is "whether thereafter the administration of the trust is governed by the local law of the other state." [43] In other words, when the situs of a trust is changed, does the law governing the trust's administration follow the change of situs? The answer turns "upon the terms of the trust, express or implied." [44]

We take no issue with the Vice Chancellor's conclusion that, in the absence of a choice-of-law provision, the settlor implicitly intends to allow a change in the law governing administration by allowing the appointment of a successor trustee.[45] We do not agree, however, that the law governing the administration of a trust can be changed only in this limited circumstance.

▮▮▮▮▮ A trust instrument may indicate, either expressly or implicitly, the settlor's intention "that the trust is *always* to be administered under the local law of the original state." [46] When discussing testamentary trusts [47] and the result of a change in the place of administration, the *Restatement's* comments indicate that although a court may approve a change in the *place* of administration, it will not order a change in the *law* of administration governing the testamentary trust if it would be contrary to the testator's intent. Such a circumstance may exist "when [the settlor] has expressly or by implication provided in the will that the administration of the trust should be governed by the local law of the state of his domicil[e] at death, even though the place of administration should subsequently be changed." [48] In that case, "the mere fact that the trustee acquires a domicil[e] in another state or that by the exercise of a power of appointment a successor trustee is appointed who is domiciled in another state does not result in a change of the law applicable to the administration of the trust." [49] Without evidence that the settlor intended for the law governing admin-

**39.** *Id.* at cmt. e.

**40.** *Id.*

**41.** *Id.*

**42.** *Id.*

**43.** *Id.*

**44.** *Id.*

**45.** *In re Peierls Family Inter Vivos Trusts,* 59 A.3d 471, 483 (Del.Ch.2012).

**46.** *Restatement (Second) of Conflict of Laws* § 272 cmt. e (emphasis added); *see also In re Chase Nat'l Bank of City of N.Y. (Stillwell),*

102 N.Y.S.2d 124, 127, 129 (N.Y.Sup.Ct.1950) (holding that the New York courts had exclusive jurisdiction over a trust's administration because the trust indenture stated that the " '[t]rustee shall not be required to account in any court other than one of the courts of [New York]' ").

**47.** *See Restatement (Second) of Conflict of Laws* § 272 cmt. e (instructing that the rules regarding a change in the place of administration are the same for inter vivos trusts as they are for testamentary trusts).

**48.** *Id.* § 271 cmt. g.

**49.** *Id.* § 272 cmt. e.

istration of the trust at its inception to *always* govern the trust, a settlor's initial choice of law is not absolute and unchangeable.

A trust instrument may expressly authorize a change in the law governing administration of the trust. The trust instrument may also implicitly authorize the change, "such as when the trust instrument contains a power to appoint a trustee in another *named* state." [50] As the *Restatement* notes, even "[a] simple power to appoint a successor trustee may be construed to include a power to appoint a trust company or individual in another state." [51] Whether the trust instrument expressly or implicitly authorizes a change in the trust's administrative governing law, "the law governing the administration of the trust thereafter is the local law of the other state and not the local law of the state of original administration." [52] That rule applies even when the trust instrument contains a choice-of-law provision. Therefore, when a settlor does not intend his choice of governing law to be permanent and the trust instrument includes a power to appoint a successor trustee, the law governing the administration of the trust may be changed.

### iii. Distilling Delaware's Case Law

After surveying the Delaware case law, the Vice Chancellor concluded that validly appointing an out-of-state trustee will effect a change in a trust's administrative

law only "if the settlor has not selected a particular law to govern the trust." [53] In effect, he reads a choice-of-law provision governing a trust's administration to reflect a settlor's intent that a particular state's law chosen will *always* govern a trust's administration, irrespective of whether the beneficiaries validly exercise a power of appointment to select an out-of-state successor trustee. The court so concluded by relying on principles derived from *Wilmington Trust Co. v. Wilmington Trust Co. (Wilmington Trust III)*,[54] *Wilmington Trust Co. v. Sloane*,[55] and *Annan v. Wilmington Trust Co.*[56] We do not read these cases to paint such broad strokes so as to stand for the proposition that a power to appoint a trustee in another state will never reflect an intention to permit a change in the law governing a trust's administration.

*Wilmington Trust III* has a confusing history. In *Wilmington Trust Co. v. Wilmington Trust Co. (Wilmington Trust I)*,[57] a settlor did not include a choice-of-law provision in an *inter vivos* trust instrument.[58] The Chancellor concluded that the settlor "intended to [create] a trust under the law of New York." At the trust's inception the donor and all of the beneficiaries were domiciled in New York, the trust's corpus was located in New York, and the settlor delivered the corpus to the trustee in New York.[59] Accordingly, the Chancellor ruled that New York law would govern the trust.[60]

50. *Id.* (emphasis added).

51. *Id.* § 272 cmt. e.

52. *Id.*

53. *In re Peierls Family Inter Vivos Trusts,* 59 A.3d 471, 483 (Del.Ch.2012).

54. 24 A.2d 309 (Del.1942).

55. 54 A.2d 544 (Del.Ch.1947).

56. 559 A.2d 1289 (Del.1989).

57. 186 A. 903 (Del.Ch.1936).

58. *Id.* at 908.

59. *Id.*

60. *Id.*

Later, the settlor consented to a Delaware trust company's appointment as a successor trustee.[61] The Chancellor then had to determine whether the trust's *validity* would be determined under New York or Delaware law.[62] We pause here to note that questions concerning a trust's validity and "the legality of the interests"[63] purportedly created under the trust are substantive rather than administrative questions.[64] Therefore, we read the Chancellor's statement—that "[h]ad the original trustee removed to Delaware bringing the trust res with her and there continued to administer the trust, it can hardly be denied that the New York law would have continued to govern its terms"[65]—to reflect the common sense proposition that the law governing construction of the trust's substantive terms would not change by reason of a change in the trust's place of administration.

The Chancellor also concluded that the settlor did not intend the beneficiaries to alter the law governing the trust's validity by the settlor having included the power to appoint an out-of-state trustee. The reason is that the power to change the trustee "was designed solely in the interest of administration and was in no wise intended as a means of selecting what body of law should govern the trust in its substantial and essential terms."[66] He further reasoned that "[t]here is no irreconcilable difficulty in having the meaning and validity

of a trust judged by the law of one jurisdiction and its administration governed by the law of another" and aptly noted that "[p]ractical considerations render necessary the principle that no matter under what jurisdiction the validity of the trust is to be determined, problems concerning its management are referable to the jurisdiction where the seat of its administration is located."[67] Accordingly, the Chancellor ruled that New York law continued to govern the trust's validity despite its Delaware administration.[68] After the parties requested reargument, the Chancellor died while the request was still pending.[69]

In *Wilmington Trust Co. v. Wilmington Trust Co. (Wilmington Trust II)*, the new Chancellor addressed the reargument motion.[70] He determined that the trust was a New York trust at its inception.[71] He also concluded, based on the settlor's deposition and the trust instrument's provision that any successor trustee would "hold the trust estate subject to all of the conditions of the deed 'to the same effect as though now named herein,'" that the exercise of the power to change the trustees legally moved the trust's location to Delaware.[72] Accordingly, Delaware law would then control a determination of the validity of any interests created under the trust instrument.[73]

In *Wilmington Trust III*, we affirmed the Chancellor's holding in *Wilmington*

61. *Id.* at 909.

62. *Id.*

63. *Id.* at 908.

64. *Restatement (Second) of Conflict of Laws* § 268 cmt. e (1971).

65. *Wilm. Trust I*, 186 A. at 909.

66. *Id.* at 910.

67. *Id.*

68. *Id.*

69. *Wilm. Trust III*, 24 A.2d 309, 312 (Del. 1942).

70. 15 A.2d 153 (Del.Ch.1940).

71. *Id.* at 160.

72. *Id.* at 163.

73. *Id.*

*Trust II.*[74] We concluded that based on the "to the same effect as though now named herein" language, the trust instrument reflected the settlor's intention "that if the trustee should be changed, the successor trustee should not only be bound by the same conditions as were expressed in the trust deed, but also that the successor trustee should have the same status, and should be considered in all respects, as an original appointee."[75] Because the trust instrument did not expressly indicate which state's law should govern, if a Delaware trust company had been the original appointee and if it had received the substantial additions to the trust that occurred in this case after the new trustee's appointment, the late Chancellor would have clearly found those circumstances "sufficient evidence of the donor's intention to submit his trust to the law of this jurisdiction."[76] Accordingly, we held that the trust language " 'to the same effect as though now named herein', as applied to the power to appoint a successor trustee in another state, must be accepted as authorizing a removal of the seat of the trust from its original location, and its reestablishment under the law of another jurisdiction."[77] We continued by observing that "[t]here is no substantial reason why a donor, in dealing with that which is his own, may not provide for a change in the location of his trust with a consequent shifting of the controlling law."[78] Therefore, we concluded the Chancellor properly applied Delaware law to determine the "validity and effect of [the beneficiary's] deed of appointment and of the rights and interests of the appointees thereunder."[79]

In *Wilmington Trust Co. v. Sloane,* the Chancellor was required to determine the validity of several appointments made by trust beneficiaries.[80] In 1925, Thomas A. Edison settled a New York *inter vivos* trust through a New York trust company for the benefit of his son, William L. Edison. The trust permitted the trustee to assign the trust fund to whomever William should designate, either through a testamentary appointment or based on the intestacy laws.[81] In his will, William instructed that the proceeds of the trust, less approximately $227,000, should be distributed to his residuary ·estate and devised the $227,000 to a Delaware trust company to be held in trust for that purpose.[82] He named his wife, Blanche Travers Edison, as the income beneficiary and granted her a testamentary power of appointment over the trust's principal.[83] After William's death, the New York trustee delivered the 1925 trust estate to the Delaware trust company as the executor of William's will.[84] Blanche exercised her testamentary power of appointment, and

74. *Wilm. Trust III,* 24 A.2d at 314.

75. *Id.*

76. *Id.*

77. *Id.*

78. *Id.*

79. *Id.*

80. *Wilm. Trust Co. v. Sloane,* 54 A.2d 544, 545 (Del.Ch.1947).

81. *Id.* at 545–46. The 1925 trust indenture "provided: 'Upon the death of the Beneficiary (William L. Edison) the said trust fund shall be assigned by the trustee to such persons and in such shares, interests and proportions, absolutely or in trust as the Beneficiary shall, by his last will and testament, designate and appoint.' " *Id.* at 549. Thomas also created a testamentary trust upon his death in 1931 for his son's benefit. *Id.* at 546.

82. *Id.* at 546.

83. *Id.*

84. *Id.* at 547.

the parties in *Sloane* later challenged the validity of those bequests.[85]

The Chancellor identified the key question to be which state's law governed Blanche's power of appointment under her husband's will.[86] Addressing the 1925 *inter vivos* trust, the Chancellor held that based on the facts and circumstances, Thomas settled a New York trust.[87] That trust instrument permitted William to not only appoint "a successor trustee in another [s]tate, but [it] also contained language which [the Chancellor] construed as an intent to permit the beneficiaries of the fund, under certain circumstances, to terminate the original trust and create a new trust in [Delaware]."[88] Therefore, given the facts and circumstances surrounding William's will, when William exercised his power of appointment in favor of "a Delaware trustee on further and different trusts, pursuant to the authority given him by the trust deed of October 2, 1925," he settled "a new trust . . . in [Delaware] by his will."[89] Accordingly, the Chancellor concluded, Delaware law would apply to the question of whether Blanche validly named the remainder beneficiaries under the testamentary power of appointment William granted her.[90] That question did not fall within the category of "administrative matters."[91]

In *Annan v. Wilmington Trust Company*, this Court was required to determine whether a settlor intended to include illegitimate offspring when the settlor used the terms "issue" and "lineal descendants" in several trust instruments.[92] We addressed choice of law in reference to a 1940 *inter vivos* trust that was created in Montreal, Canada.[93] While the trust was initially administered in Quebec, it was at the time of the case being administered in Delaware.[94] We ruled that the Vice Chancellor correctly upheld the trust instrument's choice-of-law provision requiring that Quebec law would govern the trust's construction.[95] We noted that Delaware courts will enforce a choice-of-law provision where the selected jurisdiction "bears some material relationship to the transaction." The fact that the settlor created the trust in Quebec and that the trust was initially administered in Quebec met that standard.[96] We again note that questions relating to a trust instrument's construction are not questions of administration.[97]

The principles we derive from these cases do not go quite as far as the Vice Chancellor appears to hold. We read the *Wilmington Trust* trilogy to stand for the narrow proposition that a trust instrument, through a power to appoint a trustee combined with "to the same effect as though now named herein" language can

---

85. *Id.* at 547–48.

86. *Id.* at 549.

87. *Id.* He also concluded that the testamentary trust Thomas established was a New Jersey trust. *Id.*

88. *Id.* at 550.

89. *Id.*

90. *Id.*

91. *Restatement (Second) of Conflict of Laws* § 268 cmt. e (1971).

92. *Annan v. Wilm. Trust Co.*, 559 A.2d 1289, 1290 (Del.1989).

93. *Id.* at 1290, 1293.

94. *See id.*

95. *Id.* at 1293.

96. *Id.* (citations omitted).

97. *Restatement (Second) of Conflict of Laws* § 268 cmt. e (1971).

reflect the settlor's intent to allow a beneficiary to reestablish a trust in a different state. Similarly, we read *Sloane* to hold that a settlor can permit a beneficiary to exercise a power of appointment over the trust's assets to create a new trust in another state. Finally, we read *Annan* as supporting the proposition that a choice-of-law provision concerning the law governing a trust instrument's construction will remain effective even if the trust's place of administration is changed. None of these cases, however, support the conclusion that "[w]hen a settlor has selected a governing law, the power to appoint a successor trustee in and of itself is insufficient to override this intent, unless the trust document as construed by the Court expressly provides for such a change." [98]

## 2. Applying These Principles to the 1953 Trusts, the 1957 Trust and the 1975 Trusts

■ Delaware courts apply a "seminal" rule of construction when interpreting trust agreements: "the settlor's intent controls the interpretation of the instrument. Such intent must be determined by considering the language of the trust instrument, read as an entirety, in light of the circumstances surrounding its creation. If this analysis fails to resolve the conflict, we resort to rules of construction." [99] Accordingly, we determine the settlor's intent based on the specific language of the trust instruments. The Vice Chancellor ruled that New York law presently governs the 1953 and 1975 Trusts, and that New Jersey law presently governs the 1957 Trust. [100]

First, we turn to the 1953 Trusts, which state that "all questions pertaining to [the Trusts'] validity, construction, and administration shall be determined in accordance with the laws of the State of New York." [101] The 1953 Trust Instruments also include provisions that permit the trustees to receive the commissions that a testamentary trustee may receive under New York law. [102] Additionally, an individual trustee has "the absolute right to appoint his or her substitute or successor ... trustee," [103] without any geographical restrictions on the exercise of that power of appointment.

Turning to the Trust Instruments' plain language, we agree that at the time the settlor executed the 1953 Trusts, the settlor's intent was that New York law would govern the Trusts' administration. After having carefully parsed the *Restatement's* commentary, however, we disagree with the Vice Chancellor's conclusion that a valid appointment of a trustee in another state effects a change in a trust's administrative law only "if the settlor has not selected a particular law to govern the trust." [104]

■ That conclusion would require that the 1953 Trusts *always* be administered under New York law, even if the trustees appointed out-of-state successor trustees. On that point, we adopt the *Restatement's* enlightening commentary concerning testamentary trusts, namely,

98. *In re Peierls Family Inter Vivos Trusts*, 59 A.3d 471, 484 (Del.Ch.2012).

99. *Annan v. Wilm. Trust Co.*, 559 A.2d 1289, 1292 (Del.1989) (citations omitted) (internal quotation marks omitted).

100. *Peierls Family Inter Vivos Trusts*, 59 A.3d at 489.

101. App. to Answering Br. at B727, B885.

102. *Id.* at B726, B884.

103. *Id.* at B724, B882.

104. *Peierls Family Inter Vivos Trusts*, 59 A.3d at 483.

that a change in the place of administration resulting from the valid appointment of a successor trustee will result in a change of the law of administration, unless the change would be contrary to the testator's intent. Such a circumstance could arise "when [the testator] has expressly or by implication provided in the will that the administration of the trust should be governed by the local law of the state of his domicil[e] at death, even though the place of administration should subsequently be changed." [105]

The 1953 Trust Instruments do not include any language suggesting that the Trusts' law of administration must always remain in New York even if the trustees later appoint out-of-state successor trustees. The reference to trustee commissions does not reflect an intent to mandate that administration *always* occurs under New York law; rather, the settlor intended that provision "solely as a yardstick of payment." [106] The fact that the settlor knew how to create an absolute, continuing requirement bolsters our interpretation that she did not intend New York law *always* to govern the law of administration despite a later change in the place of administration. [107]

Accordingly, we hold that although the settlor intended that the New York trustee initially administer the 1953 Trusts under New York law, the settlor implicitly permitted the law of administration to change with a change in the place of administration. The settlor manifested that intent by permitting the existing trustees to appoint successor trustees without any geographical limitation and by not otherwise indicating that New York law must remain the law of administration despite a validly executed change in the place of administration. We therefore are constrained to conclude that the Vice Chancellor erred by ruling that New York law would always govern the 1953 Trusts' administration. Here, the record establishes that, in 1999, the United States Trust Company of Texas, N.A., became a valid successor trustee to the 1953 Trusts and that the Trusts' place of administration became Texas. [108] Accordingly, the law governing the 1953 Trusts' law of administration also became Texas law. Under this analysis, the law of administration can be changed when accompanied by the appointment of an out-of-state trustee, even in the face of the Trusts' choice-of-law provision.

■■■ We next address the 1957 Trust, which states: "This Indenture shall be construed and regulated, and its validity and effect determined by the laws of the State of New Jersey." [109] The 1957 Trust Instrument also grants the trustees the power to appoint their successors without

---

**105.** *Restatement (Second) of Conflict of Laws* § 271 cmt. g (1971).

**106.** *In re Smart's Trust*, 15 Misc.2d 906, 181 N.Y.S.2d 647, 651 (N.Y.Sup.Ct.1958); *see also In re Matthiessen*, 195 Misc. 598, 87 N.Y.S.2d 787, 790, 791–92 (N.Y.Sup.Ct.1949) (noting that despite a provision that compensated trustees based on what New York's Surrogate's Court Act permitted testamentary trustees to recover, "the trust agreement does not either expressly or by a necessary implication confine the administration of the trust to [New York]").

**107.** The 1953 Trust Instruments state, for example, that "[t]here shall *always* be three (3) trustees to administer the [Trusts]." App. to Answering Br. at B723, B881 (emphasis added).

**108.** *Id.* at B733–34; B891–92. We note that Bank of America has since succeeded United States Trust as the institutional trustee, but the record does not indicate that the place of administration has moved from Texas. Opening Br. at 16; App. to Answering Br. at B622, B778.

**109.** App. to Answering Br. at B128.

geographic limitation,[110] and entitles the trustees to "receive, without judicial authorization, the commissions allowed on principal and income by the laws of the State of New York."[111]

It is a basic rule of construction that a court will prefer "an interpretation that gives effect to each term of an agreement ... to any interpretation that would result in a conclusion that some terms are uselessly repetitive."[112] As such, the term "regulated" must refer to something other than the Trust's "validity and effect." That term must also be distinct from the term "construe," which we equate with "interpret." Matters concerning a trust's validity, effect, and interpretation are not generally matters of administration.[113] We, therefore, conclude that the 1957 Trusts Instrument reflects the settlor's intent that New Jersey law initially govern administration.

Consistent with our analysis of the 1953 Trust, we do not conclude that the initial selection of New Jersey law permanently controls the law applicable to administration. Similar to the 1953 Trusts, the 1957 Trust Instrument contains no language evincing the settlor's intent that New Jersey law will *always* govern the administration of the Trust. The settlor included no restriction on the appointment of out-of-state trustees. In fact, the settlor's appointment of a New York trustee to ad-

minister a trust governed by New Jersey law, evidences her intent to ignore geographical boundaries. And, although she denoted New York law as governing the trustees' commissions, we read this measure as merely a yardstick for compensation. Nor is it clear that the New Jersey court order effects any change in the Trust's situs or administrative law, particularly since the judge ordered that a New York trustee, United States Trust Co. of New York, succeed what appeared to be the then-existing New York trustee, Bankers Trust Co.[114] We therefore conclude that the 1957 Trust is currently administered under New Jersey law, but find no evidence that the settlor's initial choice that New Jersey law "regulate" the Trust be eternal.

Turning next to the 1975 Trusts, their Trust Instrument states that the Trusts "shall be governed by and its validity, effect and interpretation determined by the laws of the State of New York."[115] There is no geographic limitation on appointment of a successor trustee.[116] The 1975 Trust Instrument also entitles the trustees to the "commissions of a sole [t]rustee under the laws of the State of New York in effect at the time such commissions become payable."[117]

As described above, we prefer an interpretation that attaches meaning to every word used by the drafter and that avoids rendering language superfluous.[118] Ac-

---

110. *Id.* at B124.

111. *Id.* at B127.

112. *O'Brien v. Progressive N. Ins. Co.,* 785 A.2d 281, 287 (Del.2001) (citation omitted).

113. *Compare Restatement (Second) of Conflict of Laws* §§ 268 cmt. d, 271 cmt. a (1971). (describing administrative matters), *with id.* § 268, cmt e. (describing matters not of administration).

114. *See* App. to Answering Br. B121, B131 (reflecting A.E. Scott's signature as Trust Offi-

cer of the Bankers Trust Company before a New York notary and stating that the Trust Officer resides in New York).

115. App. to Answering Br. B571.

116. *Id.* at B568–69.

117. *Id.* at B569.

118. *O'Brien v. Progressive N. Ins. Co.,* 785 A.2d 281, 287 (Del.2001) (citation omitted).

cordingly, the word "governed" must refer to something other than a determination about the Trusts' "validity, effect, and interpretation." Matters concerning a trust's "validity, effect, and interpretation" are not generally matters of administration.[119] Therefore, we conclude the 1975 Trust Instrument reflects the settlor's intent that New York law governs administration.

Although we conclude that the 1975 Trusts express in designate that New York law as the law of administration, it does not follow that the settlor intended that New York law would *always* be the law of administration. Based on the same analysis we applied to the 1953 Trusts, nothing in the 1975 Trust Instrument indicates that the settlor intended to limit the law of administration to New York. We therefore conclude that the 1975 Trusts' law of administration would change with a change in the place of administration. Although United States Trust Company of New York succeeded Bankers Trust Company as trustee, the 1975 Trusts have continued to be administered in New York. We highlight that fact to emphasize that this result stems from the Trusts' current *place* of administration being New York, rather than from the Trust Instrument making the settlor's initial choice of law permanent. Accordingly, New York law governs the 1975 Trusts' administration at this time.

To summarize, we affirm the Vice Chancellor's determination that Delaware law does not presently govern the administration of the Trusts. We disagree, however, with the Vice Chancellor's legal conclusion that New Jersey law governs the administration of the 1957 Trust and that New York law governs the administration of the 1953 Trusts. Lastly, we affirm the court's conclusion that New York law governs the 1975 Trusts, but reach that result because the Trusts' *place* of administration mandates this outcome, rather than any intent of the settlor that New York law always govern.

## B. The Petitions' Remaining Requests

Having disposed of the choice-of-law issue, we now turn our attention to the remaining relief requested in the Petitions. Four distinct relief-related issues remain: (1) approving the resignation of the current trustees and confirming the appointment of a successor trustee; (2) naming Delaware as the situs of the Trusts; (3) reforming the Trust Instruments to reflect the proposed new administrative scheme; and (4) accepting jurisdiction over the administration of the Trusts.

### 1. Approving the Trustees' Resignations and Confirming Appointment of a Successor Trustee

*i. The Vice Chancellor Properly Denied the 1953 Trusts and 1957 Trust Petitions Because Delaware Law Does Not Presently Apply.*

The Petitions request that the Court of Chancery approve the resignation of the current trustees and confirm the appointment of Northern Trust as a successor corporate trustee. In making that request, the Peierls face a hurdle—in that all three sets of Trusts require that there be three trustees. The Vice Chancellor correctly noted that the relief sought cannot be granted unless the Court of Chancery first exercises its equitable powers to reform the Trust Instruments, in order to

---

119. *Compare Restatement (Second) of Conflict of Laws* §§ 268 cmt. d, 271 cmt. a. (1971) (describing administrative matters), *with id.* § 268, cmt. e. (describing matters not of administration).

breathe life into the Trusts' proposed administrative structure which requires only one trustee. The Court of Chancery aptly noted, "[w]hether this Court can reform the trusts depends on what law governs the trusts." [120] As we have held, Delaware law does not presently govern the administration of either of these Trusts. Thus, as for the 1953 Trusts and the 1957 Trust we affirm the Vice Chancellor's denial of the Petitions' request that the court bless the resignations and appointment of the trustees.

### ii. The Vice Chancellor Properly Denied the 1975 Trusts Petition Because No Actual Case or Controversy Exists.

■ The resignations of the trustees of the 1975 Trusts are "conditioned" upon an unnecessary judicial approval. Moreover, Northern Trust has not actually assumed its role of successor trustee because of an equally unnecessary condition of judicial confirmation. The Vice Chancellor declined to approve the resignations and appointments under the Delaware Declaratory Judgment Act.[121] To obtain a declaratory judgment, a case must present an actual controversy:

(1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[122]

■ The Vice Chancellor properly concluded that no actual controversy exists with respect to the 1975 Trusts' Petition because the Trust Instrument expressly authorizes that which the parties ask the Vice Chancellor to approve. With respect to resignations, the 1975 Trust Instrument provides that the trustees have the power "[s]everally to resign, by delivering to any successor or co-[t]rustee written notice of such resignation, to take effect at such date as said resigning [t]rustee may specify in said notice, *without necessity for prior accounting or judicial approval.*" [123] Jeffrey Peierls, as trustee, "is authorized and empowered to designate his own successor." [124] There are similar provisions for how Moore's successor shall be appointed.[125] "If there is at any time only one individual [t]rustee ... he is author-

---

120. *In re Peierls Family Inter Vivos Trusts*, 59 A.3d 471, 476 (Del.Ch.2012).

121. *In re Peierls Family Inter Vivos Trusts*, 59 A.3d at 476–77. The Delaware Declaratory Judgment Act provides the following:
Any person interested as or through an executor, administrator, trustee, guardian or fiduciary, creditor, devisee, legatee, heir, next-of-kin or cestui que trust, in the administration of a trust, or of the estate of a decedent, an infant, a person with a mental condition, may have a declaration of rights or legal relations in respect thereto:
(1) To ascertain any class of creditors, devisees, legatees, heirs, next-of-kin or others; or
(2) To direct the executors, administrators or trustees to do or abstain from

doing any particular act in their fiduciary capacity; or
(3) To determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings.
*10 Del. C.* § 6504.

122. *Rollins Int'l Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del.1973).

123. App. to Answering Br. at B570 (emphasis added).

124. *Id.* at B569.

125. *Id.* at B568.

ized and empowered to designate another individual to serve as co-[t]rustee." [126] Furthermore, the individual trustees "are authorized and empowered to remove the corporate fiduciary, without being obliged to attribute any cause therefor, provided, they thereupon designate another corporate fiduciary in its place." [127]

■ Accordingly, the Vice Chancellor need not approve United States Trust Company of New York's removal, Northern Trust Delaware's appointment, or Jeffrey's and Moore's resignations, because the 1975 Trust Instrument provides that those changes can be made without judicial approval. Notably, there is no provision in the 1975 Trust Instrument directing how the parties should proceed if both individual trustees were to resign without designating their successors, where the Trust Instrument requires that there always be three trustees, two individual and one institutional. However, that question is not yet ripe for judicial determination, because none of the resignations and appointments, all conditioned on the court's approval, have occurred.

### 2. Naming Delaware The Situs of the Trusts

■ The Petitions next ask the Court of Chancery to declare Delaware as the situs of the Trusts. As explained above, the *Restatement* highlights the circumstances under which a settlor may authorize a change in the place of administration of a trust, or of the trust's situs, in a trust instrument.[128] The trust instrument may expressly or implicitly permit a change in the place of administration.[129] An implicit

allowance may occur where the trust's language authorizes a trustee to appoint a successor in another named state. An allowance may be evidenced by a "simple power to appoint a successor trustee." [130] We have concluded that all *inter vivos* Trusts in this case authorize a change in the place of administration. The question remains whether that place is Delaware.

At this time, no Delaware trustee administers any of the Trusts. All of the trustees have conditioned their resignations and appointments upon an unnecessary judicial rubber stamp. The 1975 Trusts expressly authorize the appointment of Northern Trust without judicial approval. The 1953 Trusts and the 1957 Trust require reformation to allow for only one trustee—relief that the Court of Chancery properly declined to grant. Without the appointment of a successor trustee, the Trusts continue to be administered in their current places of administration. For these reasons, the Vice Chancellor correctly concluded that Delaware is not currently the situs of the Trusts.

We do not, however, agree with the Vice Chancellor's conclusion that "[r]egardless, ... changing the situs of the trusts would not change the law governing administration." [131] As we have previously held, a change in the place of administration accomplished by appointing an out-of-state trustee will effect a change in the law governing administration, if the settlor has not indicated a contrary intent.

We therefore affirm the Vice Chancellor's determination to refrain from declaring Delaware the situs of the Trusts, not-

126. *Id.* at B569.

127. *Id.*

128. *Restatement (Second) of Conflict of Laws* § 272 cmt. e (1971).

129. *Id.*

130. *Id.*

131. *In re Peierls Inter Vivos Trusts,* 59 A.3d 471, 489 (Del.Ch.2012).

ing, however, that a change in the *place* of administration, if and when it occurs, may alter the *law* governing administration of the trust.

### 3. Reforming The Trust Instruments

All the Trust Petitions requested the Court of Chancery to exercise its equitable powers to reform the Trusts in several ways: (1) modifying the instruments' choice-of-law provision; (2) reducing the number of trustees from three to one; and (3) modifying the administrative structure of the Trusts to create an Investment Direction Adviser and Trust Protector, and defining their respective duties and liabilities.

Because the Trusts are not currently being administered in Delaware (there having been no transfer of situs and no appointment of a Delaware trustee), there is no basis to conclude that Delaware law would presently apply to the Trusts' administration. Therefore, whether the Court of Chancery could properly reform the Trust Instruments is a matter governed by the law of administration of the Trusts, which we have determined is Texas law for the 1953 Trusts and New York law for the 1957 and 1975 Trusts. The Petitions fail to address the issue of reformation under the law that actually governs the administration of the respective Trusts, thereby forcing the Vice Chancellor to respond to a request that was untethered to any relevant legal basis. Because the Vice Chancellor properly concluded that he

was "not in a position to address the requests for reformation," [132] we affirm the Vice Chancellor's decision to refrain granting reformation relief.

### 4. Accepting Jurisdiction

Generally, we "will not review legal issues on appeal that are not fully and fairly briefed" unless the interests of justice require us to do so.[133] The Peierls failed to address the Vice Chancellor's determination that Delaware cannot accept jurisdiction over the Trusts, except for a fleeting statement regarding the *testamentary trusts*, buried in the Peierls' discussion of Delaware's public policy that "[t]his is not a jurisdictional requirement under current Delaware trust law." [134] We are neither required nor inclined to take up the issue of Delaware's jurisdiction over the Trusts in these circumstances. Accordingly, we affirm the Vice Chancellor's denial of the Petitions insofar as they relate to requests that Delaware accept jurisdiction over the Trusts.

With respect to the 1957 Trust, we can offer some guidance in order to move these proceedings forward. Under the *Restatement*, the Peierls should have first sought the New Jersey Superior Court's permission to terminate its supervisory authority over the 1957 Trust before asking the Court of Chancery to accept jurisdiction over the Trusts. As described earlier, we consult the *Restatement* to resolve choice-of-law issues.[135] The *Restatement* helpfully identifies the jurisdictional issues that arise in cases where trusts have sig-

**132.** *Peierls Inter Vivos Trusts*, 59 A.3d at 489.

**133.** *Smith v. Delaware State Univ.*, 47 A.3d 472, 479 (Del.2012); *Roca v. E.I. DuPont de Nemours and Co.*, 842 A.2d 1238, 1242 (Del. 2004) ("The rules of this Court specifically require an appellant to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief. If an appellant fails to comply with

these requirements on a particular issue, the appellant has abandoned that issue on appeal irrespective of how well the issue was preserved at trial.").

**134.** Opening Br. at 42.

**135.** *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46–47 (Del.1991).

nificant contacts with several states. Because an *inter vivos* trust's trustee is able to perform its duties without court supervision, no particular court acquires "jurisdiction over the administration of the trust until a suit is brought in a court by the beneficiaries or by the trustee." [136]

The *Restatement* distinguishes between an unsupervised trust and a trust that is subject to a court's continuing jurisdiction.[137] A court may acquire jurisdiction in the *inter vivos* trust context, for example, where "the court is asked to appoint or has appointed a successor trustee or where by application to the court the administration of the trust becomes subject to the continuing control of that court." [138] In that case, "it becomes necessary to obtain the permission of that court to terminate such accountability." [139] The need to terminate such accountability to the court having current jurisdiction over the trusts often arises when that court is asked "to appoint a successor trustee" or "when the trustee acquires a place of business or domicil[e] in another state, or when by the exercise of a power of appointment a trustee is appointed whose place of business or domicil[e] is in another state." [140] In these instances, the court having current jurisdiction over the trust would apply the same rules applicable to testamentary trusts.[141]

As the record indicates, the Superior Court of New Jersey exercised jurisdiction over the 1957 Trust in 2001. The New Jersey judge's order (i) approved Bankers Trust Co.'s third intermediate accounting, (ii) authorized and directed Bankers Trust Co. to turn over the Trust's assets to United States Trust Co. of New York as successor corporate trustee, (iii) appointed Malcolm A. Moore as a successor co-trustee, and (iv) awarded various commissions and fees.[142] The 1957 Trust Petition declares that the Trust has "been sitused in the State of New York and administered in accordance with New York law since" the Superior Court of New Jersey's order.[143] However, it is not clear that the New Jersey judge's order reflects any change in the Trust's situs or administrative law, assuming that New Jersey law applies as discussed above. That judge merely ordered that a New York trustee, United States Trust Co. of New York, succeed what appears to be the then New York trustee, Bankers Trust Co.[144] Nowhere do the parties contend that they have sought permission from the New Jersey courts to terminate any ongoing accountability over the Trust. Under the applicable *Restatement* principles, which we herein adopt, they should do so if they intend to subject the Trust to Delaware court supervision.

## IV. CONCLUSION

Accordingly, we AFFIRM the judgment of the Court of Chancery. Jurisdiction is not retained.

136. *Restatement (Second) of Conflict of Laws* § 272 cmt. e (1971).

137. *Id.*

138. *Id.*

139. *Id.*

140. *Id.*

141. *Id.*

142. App. to Answering Br. at B97–99.

143. *Id.* at B32.

144. *See id.* at B121, B131 (reflecting A.E. Scott's signature as Trust Officer of the Bankers Trust Company before a New York notary and stating that the Trust Officer resides in New York).