## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| WILMINGTON TRUST COMPANY as Trustee of the A. FELIX DU PONT Trust dated December 28, 1934, Trust No. 2108 f/b/o Phyllis Mills Wyeth, <br><br> Petitioner, <br><br> v. <br><br> JAMES PAUL MILLS JR. and MARY CHICHESTER MILLS ABEL-SMITH, JAMES B. WYETH, solely in his capacity as the Executor of the Estate of Phyllis Mills Wyeth, and THE WYETH FOUNDATION, <br><br> Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 2019-0690-JTL |

## MEMORANDUM OPINION

Date Submitted: April 26, 2021
Date Decided: June 25, 2021

Vincent C. Thomas, Kevin A. Guerke, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Attorneys for Petitioner.*

P. Clarkson Collins, Jr., James J. Gallagher, Bryan Townsend, MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Respondent James Paul Mills, Jr.*

Matthew P. D'Emilio, Joseph L. Christensen, Kerry M. Porter, MCCOLLOM D'EMILIO SMITH UEBLER LLC; Wilmington, Delaware; *Attorneys for James B. Wyeth in his capacity as the Executor of the Estate of Phyllis Mills Wyeth.*

W. Donald Sparks, II, Chad M. Shandler, Christine D. Haynes, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Respondent The Wyeth Foundation.*

**LASTER, V.C.**

The beneficiary of a trust sought to exercise a limited power of appointment in favor of a charity. Her sibling contends that the exercise was invalid because it exceeded the scope of the grant of authority in the original trust agreement. The trustee filed a petition for instructions. The parties filed cross-motions for judgment on the pleadings. This decision holds that the exercise of the power was invalid.

## I.    FACTUAL BACKGROUND

The facts are drawn from the parties' cross-motions for judgement on the pleadings and the documents they incorporate by reference. The vast majority of the facts are undisputed, except for the facts pertaining to certain equitable defenses.

### A.    The Trust Agreement

Under a trust agreement dated December 28, 1934 (the "Trust Agreement"), Felix Du Pont established a trust that named his daughter, Alice du Pont, as the life beneficiary. Wilmington Trust Company served as trustee (the "Trustee") and designated the trust as "Trust No. 2108."

Section 1 of the Trust Agreement granted Alice the following limited power of appointment:

> Upon the death of Trustor's said daughter, Alice F. du Pont, Trustee shall assign, transfer, convey and deliver this trust fund, principal and undistributed income thereof, if any, free from this trust, unto the widower of said Alice F. du Pont, and/or unto the lawful issue of said Alice F. du Pont, in such manner and amounts and upon such trusts, terms and conditions as said Alice F. du Pont shall have appointed by the last instrument in writing which she shall have executed and delivered during her lifetime to Trustee, or failing such instrument in her last Will and Testament, or in default of any such appointment then unto her living issue, if any per stripes not per capita. . . .

Pet. Ex. A § 1 (the "Original Limited Power").[1]

The Trust Agreement also contained a provision specifying what would happen if Alice did not exercise the Original Limited Power (a "Default Provision"). The Trust Agreement stated that "failing such instrument by her Last Will and Testament, or in default of any such appointment," then the trustee would distribute the property "unto her then living issue, if any, *per stripes* and not *per capita*." *Id.* (the "Original Default Provision").[2]

## B.      Alice Exercises The Original Limited Power.

Alice had three children: Phyllis Mills Wyeth, who is deceased, and James Paul Mills Jr., and Mary Chichester Mills Abel-Smith. Between 1973 and 1986 Alice exercised the Original Limited Power in favor of Phyllis, James, and Mary on four occasions.

---

[1] In text omitted from the quotation, the Trust Agreement made the Original Limited Power "subject however to the provisions of paragraph '2' hereof." That paragraph provided that if a beneficiary had not reached age twenty-five by the time a distribution was to be made, then the beneficiary's share of the trust would be held in further trust until the beneficiary reached age twenty-five. Pet. Ex. A ¶ 2. At that point, the trust fund would be distributed to the beneficiary outright. *Id.* As events transpired, the limitations in paragraph 2 did not become applicable, and the provision plays no role in this proceeding.

[2] As with the Original Limited Power, in text omitted from the quotation, the Trust Agreement made the Original Default Provision "subject however to the provisions of paragraph '2' hereof." Pet. Ex. A ¶ 2. Once again, the limitations in paragraph 2 did not become applicable, and the provision plays no role in this proceeding.

2

### 1. The 1973 Exercise

Alice first exercised the Original Limited Power in an instrument dated February 12, 1973. Wyeth Ans. Br. Ex. A (the "1973 Exercise"). In that instrument, Alice treated Phyllis, James, and Mary identically.

The 1973 Exercise provided that upon Alice's death, "the Trustee shall divide the trust fund [of Trust No. 2108] into as many equal shares as there are children of [Alice] then living ...." *Id.* art. SECOND, ¶ (b). The 1973 Exercise instructed the Trustee to hold and manage each share as a separate trust.[3]

The 1973 Exercise granted each child the following limited power of appointment over their respective trusts:

> Upon the death of such a child[,]…this separate trust shall terminate, and the principal and accumulated or undistributed income, if any, shall be distributed among the issue of such child ... in such proportions and manner (in trust or otherwise) without regard to equality and to the exclusion of any, as he shall appoint by the last instrument in writing which he shall have executed and delivered to the Trustee during his lifetime, or failing such instrument by his Last Will and Testament. . . .

*Id.* art. SECOND, ¶ (b)(1)(D) (the "Second Limited Power"). The 1973 Exercise defined "issue" in terms of Alice's "lawful blood descendants," and it explicitly excluded adopted children. *Id.* art. FIFTH ¶¶ (a) & (a)(1). The Second Limited Power thus gave Phyllis,

---

[3] The 1973 Exercise addressed two other possibilities. One was that at the time of her death, Alice's husband might still be living. Another was that at the time of her death, Alice might have one or more children who had predeceased her and who also had living issue. Those possibilities did not come to pass, so this decision omits the relevant text.

James, and Mary the power to appoint their trusts to their lawful blood descendants, whether in trust or otherwise.

The 1973 Exercise contained the following Default Provision:

> To the extent a child of Grantor does not appoint, the trust property shall be distributed to the issue, *per stirpes*, of such deceased child….To the extent a child of the Grantor does not appoint and is not survived by issue, such property shall be distributed to the then surviving issue of Grantor, *per stirpes...*

*Id.* art. SECOND ¶ (b)(1)(D). The Default Provision in the 1973 Exercise did not expressly address what would happen if a child attempted to exercise the Second Limited Power but did so ineffectively.

The 1973 Exercise contained a provision designed to prevent the instrument from violating the rule against perpetuities (a "Perpetuities Provision"). It stated:

> Notwithstanding any other provisions of this Trust Agreement, each of the trusts created under Article SECOND shall terminate at the end of twenty (20) years and eleven (11) months after the death of the last survivor of the Grantor, the Granter's husband, all children and grandchildren who are in being as of the date this document is deemed executed.

*Id.* art. THIRD.

### 2. The 1976 Exercise

Alice next exercised the Original Limited Power through an instrument dated January 19, 1976. Wyeth Ans. Br. Ex. B (the "1976 Exercise"). In that instrument, Alice retained the basic division of Trust No. 2108 into equal shares for her children, but she treated Phyllis differently than James and Mary. Phyllis had suffered an accident and was unlikely to bear children, which explained the different treatment.

4

Most significantly, the 1976 Exercise provided that if Phyllis survived Alice, then Phyllis would receive her share "free and clear of trust." *Id.* art. SECOND, ¶ (b)(1) (the "Direct Distribution Provision"). For Alice and Phyllis, the Direct Distribution Provision carried both advantages and disadvantages. For one, after Phyllis received her share, she could do with it as she wished, free of any restrictions that Alice might otherwise impose if the property were granted in trust. For another, the property no longer would be subject to the testamentary scheme that Felix originally created. For a third, the Direct Distribution Provision would result in different tax consequences for Phyllis and for Alice's estate than would a distribution in trust.

The 1976 Exercise also changed the definition of "issue" so that the exclusion of adopted children would not apply to Phyllis. *Id.* art. FIFTH, ¶ (a)(1) (the "Adopted Child Proviso"). As a result, if Phyllis both adopted children and died before Alice, then Phyllis's adopted children would be treated as Alice's grandchildren for purposes of the 1976 Exercise, with the result that Phyllis's share of Trust No. 2108 would be divided into sub-shares for her adopted children.

The 1976 Exercise granted a limited power of appointment which, in substance, tracked the Second Limited Power from the 1973 Exercise. The version of the Second Limited Power that appeared in the 1976 Exercise did not benefit Phyllis, because the Direct Distribution Provision would result in Phyllis receiving her share outright if she survived Alice. But the Second Limited Power did potentially benefit Phyllis's issue, because if she adopted children and died before Alice, then Phyllis's share of Trust No. 2108 would be divided into sub-shares for her adopted children, and they would receive

5

their sub-shares in trust with the ability to exercise the Second Limited Power. The Second Limited Power also benefited James and Mary, because they still received their shares in trust with the ability to exercise the Second Limited Power.

As with the 1973 Exercise, the 1976 Exercise contained a Default Provision, and it tracked the provision in the 1973 Exercise. The Default Provision in the 1976 Exercise thus did not expressly address what would happen if a recipient attempted to exercise the Second Limited Power but did so ineffectively.

As with the 1973 Exercise, the 1976 Exercise contained a Perpetuities Provision. It tracked the Perpetuities Provision in the 1973 Exercise.

### 3. The 1983 Exercise

Alice again exercised the Original Limited Power through an instrument dated January 12, 1983. Wyeth Ans. Br. Ex. C (the "1983 Exercise"). Alice again treated Phyllis differently than James and Mary, but Alice substantially revised her donative scheme.

Alice made one change by eliminating the Direct Distribution Provision. In its place, Alice returned to a distribution scheme in which Phyllis, James, and Mary each received their shares of Trust No. 2108 in trust. *See id.* art. SECOND, ¶ (b).

Alice made another change by seeking to provide Phyliss with a broader power of appointment than her siblings. The basic terms of the power continued to track the language of the Second Limited Power as it appeared in the 1973 and 1976 Exercises:

> Upon the death of such child or grandchild. . . this separate trust shall terminate, and the principal and accumulated or undistributed income, if any, shall be distributed among the issue of such child or grandchild. . . but subject to the limitation contained in Paragraph (c) of this Article SECOND, as he shall appoint by the last instrument in writing which he shall have executed

6

and delivered to the Trustee during his lifetime, or failing such instrument by his Last Will and Testament. . . .

*Id.* art. SECOND, ¶ (b)(1)(D). The 1983 Exercise retained the Adopted Child Proviso for Phyllis's benefit. *Id.* art. FIFTH, ¶ (a)(1). As a result, Phyllis could adopt children, then exercise the Second Limited Power for the benefit of her adopted children.

But the 1983 Exercise went further by attempting to expand the Second Limited Power to grant Phyllis the ability to designate a charity as the recipient of her share of Trust No. 2108. The 1983 Exercise attempted to accomplish this result by adding the following language to the Second Limited Power:

> [P]rovided, however, that Grantor's daughter PHYLLIS may exercise any power conferred upon her under this subparagraph in favor of any organization or organizations to which deductible contributions may be made for purposes of federal income or estate tax laws, as well as in favor of her issue, but subject to the limitations contained in Paragraph (c) of this Article SECOND.

*Id.* art. SECOND, ¶ (b)(1)(D). (the "Original Charitable Proviso"). Only Phyllis benefitted from the Original Charitable Proviso; James and Mary did not.[4]

---

[4] The Second Limited Power as framed in the 1983 Exercise referred to "the limitations contained in Paragraph (c) of this Article SECOND." That paragraph provided as follows:

> At any time during the period provided in Paragraph (a) of Article THIRD, Trustee may distribute to any income beneficiary of a trust created under this Article or to the parent or legal guardian of any such beneficiary or apply for the benefit of such beneficiary, all or any portion of the principal of such trust which in the discretion of the Trustee is deemed necessary or appropriate for the support, maintenance or education of such beneficiary.

*Id.* The reference thus did not affect the scope of the Second Limited Power.

Like the 1973 and 1976 Exercises, the 1983 Exercise contained a Default Provision framed in terms substantively identical to the 1973 and 1976 Exercises. It thus did not address expressly what would happen if a child attempted to exercise the Second Limited Power but did so ineffectively

Like the 1973 and 1976 Exercises, the 1983 Exercise also contained a Perpetuities Provision, but the 1983 Exercise framed it differently. It now stated:

> Notwithstanding any other provisions of this document, each of the trusts created under Article SECOND shall, unless sooner terminated under the terms of this document, terminate at the end of twenty (20) years and eleven (11) months after the death of the Grantor's husband and the issue of Grantor's father, A. FELIX DU PONT, who were in being on December 27, 1934.

*Id.* art. THIRD, ¶ (a).

### 4. The 1986 Exercise

Alice exercised the Original Limited Power for the final time in an instrument dated July 25, 1986. Pet. Ex. B (the "1986 Exercise"). In that instrument, Alice continued to treat Phyllis differently than James and Mary.

Like the prior exercises, the 1986 Exercise provided that upon Alice's death, the Trustee would divide Trust No. 2108 into equal shares, one for each of Alice's surviving children, and hold each share as a separate trust. The 1986 Exercise also retained the basic framework of the Second Limited Power, framed in terms substantively identical to the 1983 Exercise. The 1986 Exercise also retained the Adopted Child Proviso.

Like the 1983 Exercise, the 1986 Exercise supplemented the Second Limited Power with a proviso that purported to empower Phyllis to designate a charity as the recipient of

8

her share of Trust No. 2108. The 1986 Exercise, however, added the phrase "to the extent permissible" to the text. The language now read:

> [P]rovided, however, that *to the extent permissible* Grantor's daughter PHYLLIS may exercise any power conferred upon her under this subparagraph in favor of any organization or organizations to which deductible contributions may be made for purposes of federal income or estate tax laws, as well as in favor of her issue, but subject to the limitations contained in Paragraph (d) of this Article SECOND.

*Id.* art. SECOND, ¶ (a)(1)(D) (the "Second Charitable Proviso") (emphasis added).

Like the earlier instruments, the 1986 Exercise contained a Default Provision. Unlike the earlier instruments, and consistent with the addition of the phrase "to the extent permissible" to the Second Charitable Proviso, the 1986 Exercise added language to address a failure to exercise the Second Limited Power fully and effectively. The Default Provision in the 1986 Exercise reads as follows:

> *To the extent a child of Grantor does not fully and effectively appoint*, the trust property, *to the extent not fully and effectively appointed*, shall be distributed to the issue, per stirpes, of such deceased child, subject to the provisions of Article FOURTH; provided, however, that any share of such property passing to any child of such deceased child of Grantor shall be held in further trust. . . . *To the extent a child of Grantor does not fully and effectively appoint* and is not survived by issue, such property *to the extent not effectively appointed* shall be distributed to the then surviving issue of Grantor, per stirpes, subject to the provisions of Article FOURTH….

*Id.* art. SECOND, ¶ (a)(1)(D) (the "Final Default Provision").

Like the earlier exercises, the 1986 Exercise contained a Perpetuities Provision. The terms of the Perpetuities Provision in the 1986 Exercise were substantively identical to the corresponding provision in the 1983 Exercise.

9

The Trustee executed the 1986 Exercise in its capacity as trustee, thereby acknowledging its existence. The Trustee also agreed to "act in accordance with its terms." Mills Reply Br. Ex. B at 18.

## C. Phyllis Seeks To Exercise The Second Limited Power.

Alice died on March 13, 2002. Phyllis, James, and Mary survived her. In accordance with the 1986 Exercise, the Trustee divided Trust No. 2108 into three equal shares, one for each child, and continued to hold each in trust. This litigation concerns the share allocated to Phyllis (the "Phyllis Trust").

By an instrument dated June 6, 2006, Phyllis sought to exercise the Second Limited Power by relying on the Second Charitable Proviso. Pet. Ex. C (the "2006 Exercise"). The 2006 Exercise recognized the limited scope of the Original Limited Power. In a WHEREAS clause, it described that power of appointment accurately as follows:

> [M]y grandfather conferred upon my mother a limited power to appoint the principal and undistributed income of Trust No 002108 as of the date of her death to and among her widower and/or her lawful issue in such manner and amounts and upon such trusts, terms and conditions as she appointed by the last instrument in writing that she executed and delivered during her lifetime to Trustee, or failing any such instrument, then by her Last Will and Testament....

Pet. Ex. C at 1. The 2006 Exercise thus recognized that the scope of the Original Limited Power extended only to Alice's widower and lawful issue; it did not contain a grant of authority comparable to the Second Charitable Proviso.

The 2006 Exercise also recognized that the source of the Second Charitable Proviso was the 1986 Exercise. Another WHEREAS clause described the power of appointment granted by that instrument as follows:

10

> [I]n Article SECOND (a)(1)(D)) of the instrument dated July 28, 1986, my mother conferred upon me a limited power to appoint the principal and undistributed income of my one-third share of Trust No 002108 held for my benefit in favor of my issue, or in favor of any organization or organizations to which deductible contributions may be made for purposes of federal income or estate tax laws, as I shall have appointed effectively by the last instrument in writing which I shall have executed and delivered to Trustee during my lifetime, or failing any such instrument, then by my Last Will and Testament.

*Id.* at 1-2. The 2006 Exercise thus captured the conflict between the Original Limited Power and the Second Charitable Proviso.

In the 2006 Exercise, Phyllis provided that the corpus of the Phyllis Trust would pass on her death, free from trust, to The Wyeth Foundation (the "Foundation"), as long as the Foundation was "then in existence and qualified ... as a charitable organization to which contributions are deductible." *Id.* at 2. She further stated that if the Foundation "is not then in existence and so qualified, I direct the Trustee under said trust agreement to distribute the trust fund, free from trust, to such organization or organizations with comparable purposes then in existence and so qualified as the Trustee shall select." *Id.*

The Trustee acknowledged 2006 Exercise. Counsel for the Trustee reviewed the instrument and regarded it as a valid exercise of the Second Limited Power as expanded by the Second Charitable Proviso.

Phyllis died on January 14, 2019. She had no children. Her will appointed her husband, James B. Wyeth, as the executor of her estate (the "Estate"). To avoid confusion between James Mills and James Wyeth, this decision refers to the latter as the "Executor."

11

**D. James Inquires About Phyllis's Exercise Of The Second Limited Power.**

By letter dated May 23, 2019, an attorney for James sent a letter to the Trustee raising concerns about whether Phyllis had exercised the Second Limited Power. *See* Pet. Ex. D (the "May 2019 Letter"). Counsel asserted that James was "not aware of any specific purported exercise of Phyllis's limited power of appointment under the Trust." *Id.* at 2. Counsel posited that if an exercise existed, then "it would have been made, nominally, in favor of one or more organizations to which deductible contributions may be made for purposes of federal income or estate tax laws." *Id.* In other words, counsel suggested that Phyllis would have relied on the Second Charitable Proviso.

Counsel maintained that if Phyllis had attempted to appoint a charity as the recipient of the Phyllis Trust by relying on the Second Charitable Proviso, then the exercise would conflict with the Original Limited Power. It therefore would have been invalid under Section 505 of Title 25 of the Delaware Code, which prohibited the holder of a limited power of appointment from using it to create a subsequent limited power of appointment that expanded the objects of the original limited power. Counsel maintained that absent a valid exercise of the Second Limited Power, the corpus of Phyllis's Trust would be distributed for the benefit of Alice's surviving children—James and Mary. *Id.* at 2.

The Executor and the Foundation have asserted in this litigation that James knew or should have known that Phyllis relied on the Second Charitable Proviso before his lawyer wrote the May 2019 Letter. The Executor and the Foundation note that in 2002, when Alice died, James received his share of Trust No. 2108 in trust under the terms of the 1986 Exercise, which also created the Phyllis Trust and contained the Second Charitable Proviso.

12

The Executor and the Foundation further allege that by 2008 at the latest, James knew or should have known about Phyllis's intent to designate the Foundation as the recipient of the corpus of the Phyllis Trust. The Executor and the Foundation assert that James waited until after both Alice and Phyllis died before challenging the validity of the 2006 Exercise.

## E.      This Litigation

On August 29, 2019, the Trustee commenced this action by filing a verified petition for instructions. The petition named James, Mary, the Foundation, and the Executor as respondents. The respondents filed answers, and the pleading closed.

James next filed a motion for judgment on the pleadings. He seeks a determination that the 2006 Exercise is invalid because it conflicts with the Original Limited Power. He maintains that under the terms of the 2006 Exercise, the corpus of the Phyllis Trust should be distributed to Mary and himself.

The Foundation opposed James' motion and filed a cross-motion for judgment on the pleadings. The Foundation seeks a determination that that the 2006 Exercise is valid under the plain language of the Second Charitable Proviso. Alternatively, the Foundation asserts that the 1986 Exercise is ambiguous, requiring discovery to explore Alice's intent. The Foundation also maintains that James' cannot obtain relief on the pleadings because of an array of equitable defenses. Although the Foundation invokes multiple defenses, each rests on the premise that James delayed inequitably in challenging the 2006 Exercise. Finally, the Foundation argues that the 2006 Exercise can only be invalid if the 1986 Exercise was invalid, in which case the Foundation maintains that the Trust Agreement

13

calls for Phyllis's share to be distributed outright to James, Mary, and the Estate. In that event, the Executor would control Phyllis's share.

The Executor also opposed James' motion and filed a cross-motion for judgment on the pleadings. The Executor generally takes the same positions as the Foundation, except he also contends that the Trustee breached its fiduciary duties by failing to raise any issues about the validity of the Second Charitable Proviso.

## II. LEGAL ANALYSIS

The parties have filed cross motions for judgment on the pleadings under Chancery Rule 12(c). A motion for judgment on the pleading may be granted when there is "no material issue of fact," and the movant "is entitled to judgment as a matter of law." *Dessert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, LP*, 624 A.2d 1199, 1205 (Del. 1993).

"[J]udgment on the pleadings…is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact." *NBC Universal, Inc. v. Paxton Commc'n Corp.*, WL 2005 1038997, at *1, *5 (Del. Ch. April 29, 2005). When reading a contract, the court construes it "in accordance with [its] terms to give effect to the parties' intent." *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013). To determine the parties' intent, the court considers "the parties' words and the plain meaning of those words." *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008) (internal quotation marks omitted). When the language is unambiguous, "extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232

14

(Del. 1997). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.3d 728, 739 (Del. 2006).

Just as a court interpreting a contract strives to effectuate the parties' intent, a court interpreting a trust agreement strives to effectuate the settlor's intent. *In re Peierls Fam. Inter Vivos Tr.*, 77 A.3d 249, 263 (Del. 2013). Just as a court relies on the unambiguous language of a contract to establish the parties' intent, a court relies on the unambiguous language of a trust instrument establishes the settlor's intent. *See id.* As when interpreting a contract, a court gives effect to unambiguous language by applying the ordinary meaning of the words. *DiSabatino v. Diferdinando*, 2002 WL 2005743, at *1, *2 (Del. Ch. Aug. 13, 2002). "[T]he Court will not consider extrinsic evidence to vary or contradict express provisions of a trust instrument that are clear, unambiguous, and subject to interpretation." *Wilmington Tr. Co. v. Annan*, 531 A.2d 1209, 1211 (Del. Ch. 1987).

Given the parallel interpretive principles, a motion for judgment on the pleadings is an appropriate vehicle for enforcing an unambiguous trust agreement or related donative instrument, just as it is for an unambiguous contract. As discussed below, the language of the Trust Agreement and related instruments is plain and unambiguous.

A. **The Effectiveness Of The 2006 Exercise**

The parties dispute whether Phyllis could rely on the Second Charitable Proviso to exercise the Second Limited Power for the benefit of the Foundation. As a matter of law, she could not.

15

Under the common law rule, the holder of a power of appointment (the "first generation" or "original" power of appointment) can use that power to create a further power of appointment (the "second generation" or "derivative" power of appointment). As a matter of law, the holder of the first generation power of appointment cannot create a second generation power of appointment that confers greater authority than the first generation power of appointment. If the first generation power of appointment is a limited power, then those limitations apply to the second generation power of appointment and to any additional derivative powers of appointment that the second generation holder or subsequent holders may create. Each power holder can create a derivative power of appointment with lesser powers by imposing additional restrictions or limitations on the derivative power, but a power holder cannot create a derivative power of appointment that expands the power beyond the grant of authority that the power holder received.[5]

Under the common law rule, if the settlor of a trust creates a first generation power of appointment and stated that the power only could be used to appoint the corpus of the trust in favor of a limited class of persons (the "appointees" or "objects" of the power), then the holder of that power can use it to create a second generation power of appointment

---

[5] *Equitable Tr. Co. v. Foulke*, 40 A.2d 713, 716 (Del. Ch. 1945); *Restatement (Third) of Property: Wills and Other Donative Transfers* § 19.14 (Am. Law Inst. 2011) [hereinafter Restatement (Third)]; *accord* John A. Borron, Jr. et al., *2 Simes and Smith, The Law of Future Interests* § 977 (3d ed. & Supp. 2021); *Restatement (Second) of Property: Donative Transfers* § 19.4 (Am. Law Inst. 1986); *Restatement (First) of Property* § 359 (Am. Law Inst. 1940); *see also* Nat. Conference of Comm'rs of Unif. State Laws, *Uniform Powers of Appointment Act* § 305(c)(3)-(4) (updated Jan. 11, 2019), available at https://www.uniformlaws.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=eabae880-344b-d919-ac96-87b0091af08a.

16

in favor of any permissible appointee of the first generation power. However, the holder cannot expand the scope of the second generation power beyond the first by adding additional objects. *See Foulke*, 40 A.2d at 716; Simes and Smith, *supra*, § 977.

The same rule applies to the holder of the second generation power of appointment. The holder of that power can use it to create a third generation power of appointment in favor of any of the permissible appointees of the second generation power, but the holder cannot expand the scope of the third generation power beyond the scope of the second (or the first) by adding additional objects.

The common law rule applied in Delaware when Felix created the Original Limited Power, when Alice executed the four instruments that exercised the Original Limited Power (including the operative 1986 Exercise), and when Phyllis executed the 2006 Exercise. Under the common law rule, Phyllis could not exercise a power of appointment in favor of the Foundation. The Trust Agreement only authorized the holder of the Original Limited Power to exercise the power in favor of Alice's widower or her lawful issue. Alice could and did exercise her authority under the Original Limited Power to create the Second Limited Power, but she could not expand the class of appointees who could be objects of the Second Limited Power. When Phyllis attempted to exercise the Second Limited Power in favor of the Foundation, she exercised it in favor of an appointee that was not contemplated by the Original Limited Power. The attempted appointment therefore failed.

17

### 1. The Trust Agreement Did Not Authorize A Power Holder To Add Appointees

The common law rule against permitting a power holder to add appointees is a default rule. A settlor can deviate from the common law rule by including express language in the first generation power of appointment that permits the power holder to add appointees. The common law authorities framed the rule as a presumption against the power to add appointees, which the power holder could overcome by pointing to language in the instrument that supported the existence of that power. *See* Restatement (Third) § 19.14.

The Foundation claims that the Trust Agreement contained language sufficient to overcome the presumption, but that view rests on a motivated reading of the Trust Agreement. According to the Foundation, the Original Limited Power empowered Alice to add appointees because it provided that the trust fund would be conveyed "in such manner and amounts and upon such trusts, terms and conditions as [Alice] shall have appointed." Pet. Ex. A § 1. The Foundation contends that this language included the power to add appointees.

In making this argument, the Foundation fails to distinguish between the object of a power, i.e. the permissible appointees, and the form of property interest that the object of a power can receive, i.e. property free from trust, in trust, or subject to other terms, conditions, and limitations. *See Equitable Tr. Co. v. James*, 47 A.2d 303, 306 (Del. Ch. 1946). The two concepts are distinct. The first refers to the recipient of the property. The second refers to the extent of the property interest that the recipient receives, traditionally

18

described as the quantum of the estate. *See id.*; *Wilmington Tr. Co. v. Wilmington Tr. Co.,* 180 A. 597, 602 (Del. Ch. 1935), *modified on other grounds,* 186 A. 903 (Del. Ch. 1936). A grantor can create a power of appointment that is general as to its objects but limited as to the quantum of estate that the holder can confer. Or a grantor can create a power of appointment that is limited as to its objects, but unlimited as to the quantum of estate that the holder can confer. *See Foulke*, 40 A.2d at 717.

Through the Original Limited Power, the Trust Agreement conferred on Alice a power of appointment that was limited as to its objects (her widow or lawful issue) but unlimited as to the quantum of estate that she could confer on those objects ("in such manner and amounts and upon such trusts, terms and conditions as [Alice] shall have appointed"). The language that the Foundation cites only addressed the quantum of estate. It did not address the permissible objects. The language therefore did not authorize Alice to create additional objects, as she attempted to do through the Second Charitable Proviso.

### 2. The Appointee Expansion Statute Does Not Change The Result.

The General Assembly has adopted a series of statutes that establish rules governing powers of appointment. Initially, the statutes codified the common law rule. After Phyllis died, the General Assembly amended the operative statute to permit the holder of a limited power to enlarge the class of permissible appointees, unless the instrument creating the power of appointment specifically said that its holder could not add additional appointees

(the "Appointee Expansion Statute"). The Appointee Expansion Statute does not change

the outcome in this case.[6]

The General Assembly first enacted legislation governing powers of appointment

in 2003. *See* Del. H.B. 194, 142d Gn. Assem. § 2 (2003). The statute provided as follows:

> If the instrument creating a power of appointment, whether limited or
> general, does not expressly manifest a contrary intent of the donor, the donee
> of such a power, in addition to exercising the power in any other manner
> permitted by law and the instrument creating the power, may effectively
> appoint all or a portion of the assets, subject to such power to a trustee or
> trustees for the benefit of one or more objects of the power and may, in
> addition, create in an object of the power a general power of appointment,
> exercisable during life or at death, over assets subject to the original power
> or a limited power of appointment, exercisable during life or at death, to
> appoint such assets among objects all of whom are objects of the original
> power.

25 *Del. C.* § 505 (2003). Consistent with the common law rule, Section 505 only permitted

the holder of a limited power of appointment "to appoint such assets among objects all of

whom are objects of the original power." The power holder could not expand the scope of

the power of appointment by adding new objects.

---

[6] Because the longstanding common law rule prohibited a power holder from adding appointees, and because the Delaware statute codified that common law rule from 2003 until 2019, it would be counterintuitive for a power of appointment to contain a prohibition on the exercise of a power that everyone understood to be non-existent. Rather than expressly stating that the holder of the power could not add appointees, the drafter would rely on the background law and leave the instrument silent on that point. By reversing the default rule, the Appointee Expansion Statute thus likely changed the donative schemes of many settlors, albeit to the benefit of current power holders. This case does not present the question of whether a statute can change retroactively a settlor's donative scheme.

In 2014, the General Assembly amended Section 505 by adding new subsections and re-designating the original text as subsection (a). In lieu of the term "limited power," the General Assembly substituted "nongeneral power." The statute now read.

> Unless the instrument creating a nongeneral power of appointment expressly manifests a contrary intent of the donor, the donee of such a power, in addition to exercising the power in any other manner permitted by law and the instrument creating the power, may effectively appoint all or a portion of the assets subject to such power to a trustee or trustees for the benefit of 1 or more objects of the power and may, in addition, create in an object of the power a general power of appointment, exercisable during life or at death, over assets subject to the original power or a nongeneral power of appointment, exercisable during life or at death, to appoint such assets among objects all of whom are objects of the original power.

25 *Del. C.* § 505(a) (2014). Consistent with the common law rule, the 2014 version of Section 505(a) continued only to permit the holder a limited power of appointment—now termed a nongeneral power of appointment— "to appoint such assets among objects all of whom are objects of the original power." The power holder remained unable to expand the scope of the power of appointment by adding new objects.

Effective June 19, 2019, after Phyllis died and this dispute arose, the General Assembly amended Section 505(a) again, this time to add the Appointee Expansion Statute. As a result of the amendment, Section 505(a) currently states:

> Unless the instrument creating a nongeneral power of appointment expressly manifests a contrary intent of the donor, the donee of such a power, in addition to exercising the power in any other manner permitted by law and the instrument creating the power, may effectively appoint all or a portion of the assets subject to such power to a trustee or trustees for the benefit of 1 or more objects of the power and may, in addition, create in an object of the power a general or nongeneral power of appointment, exercisable during life or at death, over assets subject to the original power o*r may create in a person who is not an object of the power* a nongeneral power of appointment,

21

> exercisable during life or at death, to appoint such assets among objects all of whom are objects of the original power.

25 *Del. C.* § 505(a) (2019). The Appointee Expansion Statute changed the law so that future power holders in Alice's and Phyllis's positions would be able to use a limited power of appointment to create a power of appointment "in a person who is not an object of the power."

The enactment of the Appointee Expansion Statute does not change the result in this case. The history of Section 505 shows that in 2003, the General Assembly initially codified the common law rule, reinforcing the conclusion that when Phyllis executed the 2006 Exercise, she could not appoint her trust to an appointee outside the scope of the Original Limited Power. The attempt to appoint the Foundation as the recipient of the trust corpus was therefore invalid.

The enactment of the Appointee Expansion Statute demonstrates instead that it required a change in the law to authorize what Phyllis attempted to do. A statute was not necessary; a court ruling could have altered the common law rule. Some change in the law, however, was needed.[7]

---

[7] James argued persuasively in his opening brief that the enactment of the Appointee Expansion Provision did not retroactively validate the 2006 Exercise. The Foundation and the Executor did not respond to that argument, which is therefore conceded. This decision accordingly does not address that point.

22

## B. The Disposition Of The Phyllis Trust

Because Phyllis could not validly exercise the Second Limited Power in favor of the Foundation, the court must determine the fate of the Phyllis Trust. There are two possible results. James relies on the Final Default Provision in the 1986 Exercise, which provided that if one of Alice's children failed to exercise the Second Limited Power fully and effectively, then the property that was not effectively appointed would be distributed to Alice's "then surviving issue, per stirpes," with "then surviving issue" measured at the time of the child's death. When Phyllis died, Alice's "then surviving issue" were James and Mary, so the property in the Phyllis Trust would go to them. The Foundation and the Executor rely on the Original Default Provision in the Trust Agreement, which provided that if Alice failed to exercise the Original Limited Power, then when she died, the Trustee would distribute the property held in Trust No. 2108 distribute "unto her living issue," with "living issue" measured at the time of Alice's death. Pet. Ex. A, § 1. When Alice died, "her living issue" were James, Mary, and Phyllis. Under that distribution scheme, Phyllis would have inherited a one-third share of Trust No. 2108 outright. If Phyllis had continued to retain the property when she died, then it would have passed to the Estate.

The outcome depends on the validity of the 1986 Exercise. The Foundation and the Executor maintain that under the rule that prohibits a power holder from expanding the class of permissible appointees, the Second Charitable Proviso was invalid. James responds that the plain language of the Second Charitable Proviso made its availability conditional: Alice granted Phyllis the power to exercise the Second Limited Power in favor of a charitable organization "to the extent permissible." Alice likewise provided in the Final

23

Default Provision for a default distribution to the extent that one of her children did not "fully and effectively appoint" the trust property. James maintains that the 1986 Exercise validly granted Phyllis the power to exercise authority to the extent it was permissible under the law at the time she exercised the power. Under the plain language of the 1986 Exercise, James is correct.

### 1. The Validity Of The 1986 Exercise

The plain language of the 1986 Exercise establishes its validity. The Second Charitable Proviso granted Phyllis the power to appoint the Phyllis Trust to a charity "to the extent permissible." Pet. Ex. B, art. Second(a)(1)(D). The plain meaning of this phrase granted Phyllis the authority to appoint the Phyllis Trust to a charity only if she could exercise that authority validly under the conditions in existence when she exercised the power.

No legal principle restricts a settlor, power holder, or property owner from anticipating the possibility that at some point in the future, a party may be able to take action permissibly, regardless of whether or not that action is permissible at the time of drafting. Conditional and forward-looking language makes the drafter's intent clear. The phrase "to the extent permissible" plainly authorizes the holder of the right to exercise it, if and only if it is permissible to do so. The language protects the instrument itself from challenge while also eliminating any doubt that the action in question can be taken in the future if it is permissible.

The Foundation and the Executor vigorously dispute this reading. First, they claim that the phrase "to the extent permissible" only contemplated the possibility that the rule

of perpetuities might foreclose Phyllis from exercising the Second Limited Power. To support that interpretation, the Foundation and the Executor compare the 1986 Exercise to the 1983 Exercise, revealing a series of changes in the Perpetuities Provision. It is true that the 1986 Exercise made those changes, but the "to the extent permissible" language does not contain any cross reference or limitation that would restrict its application to a perpetuities issue. It does not say, for example, "to the extent it is permissible to exercise this power of appointment in accordance with the rule against perpetuities." Instead, the 1986 Exercise contains specific language that makes the exercise of the Second Limited Power effective only if permitted by the rule against perpetuities. *See* Wyeth Ans. Br. Ex. C, art. Second(a)(1)(D). Interpreting the phrase "to the extent permissible" as referring only to the perpetuities period would render that language superfluous, which is contrary to standard canons of construction. *See Wilmington Tr. Co. v. Wilmington Tr. Co.*, 24 A.2d 309, 313 (Del. 1942) (explaining the "general rule of construction that no word or phrase shall be … treated as superfluous, redundant or meaningless, if to it a meaning can be given which is reasonable and consistent with the object and purpose of the writing considered as a whole").

The phrase "to the extent permissible" is broad and unconstrained. It encompasses any reason why it might be impermissible or permissible for Phyllis to rely on the Second Charitable Proviso, and it authorizes Phyllis to appoint the Phyllis Trust in favor of a charity only "to the extent permissible." Alice thus validly exercised her authority when executing the 1986 Exercise. Phyllis, however, failed to validly exercise her authority permissibly when executing the 2006 Exercise.

25

The Foundation and the Executor next contend that Alice could not have intended to make the Second Charitable Proviso conditional because she originally included the Original Charitable Proviso in the 1983 Exercise, and that instrument did not include the phrase "to the extent permissible." That is true, and the omission of this phrase is consistent with the language of the 1983 Exercise when read as a whole, which only expressly addressed the possibility that a child might fail to exercise the Second Limited Power. The 1983 Exercise, like the two prior exercises, did not expressly contemplate the possibility that a child might attempt to exercise the power but fail to do so fully and effectively. The 1986 Exercise added language at multiple points to address explicitly the possibility of an incomplete or ineffective exercise. When read as a whole, the language of the 1986 Exercise plainly contemplates that a child might exercise the Second Limited Power in an impermissible or ineffective manner, including by attempting to rely on the Second Charitable Proviso impermissibly. The fact that the 1983 Exercise was not as thorough in anticipating future possibilities does not undermine the plain meaning of the 1986 Exercise. *See du Pont Weymouth v. Wilmington Tr. Co.*, 1991 WL 148808, at *1, *3 (Del. Ch. Aug. 2, 1991) (rejecting an argument about the donor's intent when creating power of appointment that would "contravene th[e] clear language" of other parts of the trust agreement when read as a whole).

In their third argument, the Foundation and the Executor maintain that Alice could not have contemplated that Phyllis might not be able to exercise the Second Limited Power in favor of a charity because then Phyllis would not be able to exercise the Second Limited Power at all. They point out that Phyllis could not have children of her own, and they

26

conclude that if Phyllis could not exercise the Second Limited Power in favor of a charity, then she had no other options. Their logic overlooks the fact that Alice included the Adopted Children Proviso in the 1976 Exercise, the 1983 Exercise and the 1986 Exercise for Phyllis's benefit. If Phyllis adopted children, then she could exercise the Second Limited Power in favor of her adopted children. The disposition framework in the 1986 Exercise thus created a path for Phyllis to exercise the Second Limited Power, even if she could not rely on the Second Charitable Proviso.

In their fourth argument, the Foundation and the Executor assert that Alice plainly wanted Phyllis to be able give the Phyllis Trust to charity, and so if Alice had thought that Phyllis might not be able to rely on the Second Charitable Proviso, then she would have followed another donative course, such as giving Phyllis her share outright. In the face of the plain language of the 1986 Exercise, that kind of speculation cannot carry the day. Alice had a range of donative options available to her. She could have given Phyllis her share of Trust No. 2108 outright, as she did in the 1976 Exercise through the Direct Distribution Provision. That course of action would have carried with it various advantages and disadvantages, including tax implications. Instead, Alice chose to appoint Phyllis's share of Trust No. 2108 to her in trust, while giving Phyllis the benefit of the Second Limited Power. That course of action carried a different set of advantages and disadvantages. The court must analyze the validity of Alice's actions based on the course she formally took, not paths she might have taken. *Cf. Orzeck v. Englehart*, 195 A.2d 375, 377 (Del.1963) (discussing doctrine of independent legal significance). *See generally* C. Stephen Bigler &

27

Blake Rohrbacher, *Form or Substance? The Past, Present, and Future of the Doctrine of Independent Legal Significance*, 63 Bus. Law. 1 (2007).

Finally, the Foundation and the Executor claim that reading the plain language of the Second Charitable Proviso is non-sensical because it would require the court to assume that Alice anticipated the adoption of the Appointee Expansion Statute. To make that notion seem all the more extreme, the Foundation and the Executor stress that the General Assembly first enacted Section 505 in 2003, a year after Alice died, and did not enact the Appointee Expansion Statute until 2019, thirty-three years after Alice executed the 1986 Exercise. But that argument is itself extreme. Alice did not have to anticipate the passage of a specific statute in a specific year. She and her lawyers merely had to recognize that a longstanding common law rule prohibited the holder of a limited power of appointment from expanding the universe of permissible appointees, and they simply had to contemplate the possibility that at some unknown point in the future, the law might change. They did not have to predict when the change might arrive, nor whether it would permit the addition of appointees broadly or only the possibility of charitable appointees, nor whether it might come via statute, court decision, regulation, or otherwise. They only had to recognize that if Phyllis executed an instrument that relied on the Second Charitable Proviso, then there were two states of the world that might exist: Either Phyllis would rely on the Second Charitable Proviso at a time when adding a charity as an appointee was permissible, or she

would rely on it at a time when it was impermissible. The 1986 Exercise sensibly addressed both alternatives.[8]

## 2. The Final Default Provision In The 1986 Exercise Controls.

Because the 1986 Exercise is valid, the Final Default Provision in that instrument controls, The Phyllis Trust vests in Alice's "then surviving issue, per stirpes," with "then surviving issue" measured at the time of Phyllis's death. The Phyllis Trust therefore goes to James and Mary.

The Executor argues for a different result under the *Foulke* decision. There, a father (Ashton[9]) granted his daughter (Mabel) a power of appointment over a testamentary trust. Mabel exercised the power to create a further trust for the benefit of her five children and their issue, *per stirpes*. A dispute arose because the power of appointment only permitted Mable to exercise it in favor of her children, not their issue. Mabel's attempt to exercise the limited power in favor of her children's issue thus purported to add additional

---

[8] Relatedly, the Executor argues that to infer that Phyllis anticipated the passage of the 2019 Amendment contravenes Delaware law. Wyeth Reply Br. at 7. He relies on Section 3330(a) of the Trust Act, which states: "There shall be no presumption that a testator or trustor did or did not intend that any law apply to a governing instrument which was not in effect on the date of execution of such governing instrument." 12 *Del. C.* § 3330(a)(1). He contends that as a matter of law, the court cannot interpret the 1986 Exercise as anticipating the Appointee Expansion Statute. For one thing, this decision has not interpreted the 1986 Exercise as anticipating the Appointee Expansion Statute. The 1986 Exercise merely anticipated the two possible states of the world that could exist if Phyllis exercised an instrument that relied on the Second Charitable Proviso. For another, Section 3330(a) only addresses the possibility of a presumption. It does not say anything about interpreting the plain language of an instrument.

[9] The father's name was James Ashton Bayard. To avoid introducing another James, this decision refers to him as Ashton.

appointees, which she could not do. Nevertheless, when Mable died, two of her children (Jean and Elizabeth) remained living. The exercise of the power was therefore valid as to them, even if invalid as to the issue of her other children. *Foulke*, 40 A.2d at 715–17.

The court considered how to distribute the property held in trust. The court noted that "[u]nder the old general rule, when the donee of a power of appointment includes persons who are not objects of the donor's bounty, the excess appointment is alone invalid." *Id.* at 717. If the court applied the "old general rule," then Mable's exercise would be treated as valid as to Jean and Elizabeth, and they each would receive a one-fifth share of the trust under the exercise. *Id.* The remaining three-fifths of the property would pass under Ashton's will to Mabel's children and their issue, *per stirpes*, resulting in Jean and Elizabeth receiving another one-fifth share of the property that Mabel had not validly appointed. Under that distribution scheme, Jean and Elizabeth would each receive 32% of the trust property. Yet Mable's scheme and Ashton's scheme both demonstrated an intent for each child, and their issue, to receive an equal 20% share of the property.

Mabel's grandchildren (the issue of her deceased children) viewed this result as inequitable and asked the court to treat Mabel's entire exercise of the power as invalid. *Id.* The court noted that more recent authorities called for considering whether the donative scheme of the original grantor would be better served by holding the instrument entirely invalid and allowing the property to pass in default of appointment. *Id.* at 718. After examining Ashton's will, the court concluded that Ashton had demonstrated an intent for each child and their issue to receive an equal share of the property. That distribution could

30

be achieved by holding Mabel's exercise wholly invalid, so the court reached that result. *Id.* at 719.

The Executor argues that the same equitable principles should govern here. The Executor correctly observes that if the 2006 Exercise fails, and if the Phyllis Trust goes to James and Mary under the 1986 Exercise, then James and Mary each will receive half of the property originally in Trust No. 2108. Under the Trust Agreement, however, the Original Default Provision contemplated that if Alice did not exercise the Original Limited Power, then when she died, the property in Trust No. 2108 would descend to Alice's "then living issue, if any, per stirpes and not per capita." Pet. Ex. A § 1. The Executor argues that the Trust Agreement evidences an intent for each of Alice's children who were alive at her death to receive an equal share. The Executor also argues that in each of her four exercises, Alice sought to give each of her children the benefit of an equal share. When Alice died, Phyllis, James, and Mary were her then-living issue, so if Alice failed to exercise the Original Limited Power, then the Original Default Provision would have resulted in each child receiving one-third of the property held in Trust No. 2108. The Estate argues that the court should impose that result in this case by holding the 1986 Exercise is wholly invalid and directing the Trustee to transfer the Phyllis Trust to the Executor, free from trust.

The impediment to the Executor's argument is that unlike in *Foulke*, Alice explicitly addressed the possibility that a child might attempt to exercise the Second Limited Power, but do so impartially or ineffectively. Alice included the Final Default Provision in the 1986 Exercise, which states what should happen if that came to pass. In *Foulke*, the instrument did not address what would happen if the limited power was exercised in a

31

manner that was partially invalid, and so the court was left without guidance. Lacking explicit direction from Mabel as to what should occur in that circumstance, the *Foulke* court applied equitable principles. In this case, the 1986 Exercise addresses that issue directly. With Alice having exercised her authority, there is no room for the court to rely on equitable discretion. The court's task instead is to implement Alice's intent as expressed in the plain language of the 1986 Exercise.

The Final Default Provision governs this case. The property held in trust goes to James and Mary.

## C. Laches

The Foundation and the Executor contend that James cannot challenge the 2006 Exercise now because he ostensibly should have filed a lawsuit challenging the Second Charitable Proviso years ago. The Foundation and the Executor invoke laches, acquiescence, waiver, equitable estoppel, and unclean hands, each based on the same underlying theory. Parsing each defense is unnecessary. The contention that a party delayed bringing a claim for an inequitably long time falls squarely within the domain of laches, so this decision analyzes that doctrine. The facts alleged, however, are too meager to support a reasonable inference that James waited too long to sue.

"A finding of laches generally requires the presence of three factors: claimant's knowledge of the claim, unreasonable delay in bringing the claim, and resulting prejudice to the defendant." *Kraft v. Wisdom Tree Ins., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016). The contention that James knew about the potential invalidity of the Second Charitable Proviso is speculative at best. So too is the contention that he knew Phyllis had relied on it. The

32

Foundation and the Executor allege only that because James was a beneficiary of the 1986 Exercise, he should have identified the Second Charitable Power and disputed its validity in case Phyllis might someday rely on it at a time when Delaware law did not permit it.

In support of its laches defense, the Executor relies on a single, inapposite authority: *In re Tr. F/B/O Dorothy J. D'Amato Under Agreement of George G. D'Amato Dated February 19, 2014, As Amended*, C.A. No. 2020-0087-JTL (Aug. 3, 2020). The *D'Amato* case involved a unique and complex dispute. The deceased settlor, George D. D'Amato, used his will to create a series of trusts. His donative plan contemplated that after the death of his widow and any of his issue, the trusts would distribute their property to a foundation named the "George D. D'Amato Family Foundation" (the "Planned Foundation"). The settlor died without creating the Planned Foundation. After his death, his son created a foundation with that name, but with a purpose contrary to what the settlor contemplated (the "Alternative Foundation").

The trustee for the settlor's widow sought a declaration that the Alternative Foundation was not a valid remainder beneficiary under the settlor's will. In litigation involving the same trusts that was pending in New York, the Alternative Foundation had intervened on the grounds that it was a valid remainder beneficiary. In response to the Delaware petition, however, the Alternative Foundation argued that the dispute over its status as a remainder beneficiary was not ripe, because the trustee's power to invade trust principal for the widow's benefit could result in nothing being left for the Alternative Foundation to receive.

33

The court held that the dispute was ripe, applying the principle that when assessing ripeness, the court makes "'a practical evaluation of the legitimate interest of the plaintiff in a prompt resolution of the question presented and the hardship that further delay may threaten.'" *Id.* ¶ 3(d) (quoting *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1238 (Del. Ch. 1987)). The court noted that the dispute over the status of the Alternative Foundation was sufficiently concrete to address, because the Alternative Foundation had asserted its status as a remainder beneficiary on multiple occasions, including in the litigation pending in New York. *Id.* ¶ 3(e). In addition, because the Alternative Foundation's status turned on the settlor's will, the facts necessary to adjudicate the dispute were fully developed. The court also observed that the trustee "deserve[s] to know the status of the Foundation as a remainder beneficiary when making decisions regarding the Trusts." *Id.* ¶ 3(f).

Notably, the question in *D'Amato* involved ripeness, not laches. The court held that the trustee of the widow's trust could litigate whether the Alternative Foundation was a remainder beneficiary. The court did not suggest that the trustee would have been barred from litigating the issue under the doctrine of laches if the trustee had waited to file suit later. The *D'Amato* order does not suggest that the trustee's claim would have been foreclosed if the trustee had chosen instead to wait until the widow had died. The *D'Amato* ruling is thus legally inapposite. The ruling is also factually distinguishable. It involved a party taking conflicting positions, with the Alternative Foundation claiming that the dispute over its status as a remainder beneficiary was not ripe while simultaneously relying on that status in litigation in New York. The *D'Amato* case also involved a situation where facts

34

concerning the Alternative Foundation's status as a remainder beneficiary could not change and where the possibility was remote that the trustee would deplete the trusts and avoid the need for a decision.

In contrast to *D'Amato*, neither Alice nor Phyllis ever confronted James with a claim that the Second Charitable Proviso or the 2006 Exercise were valid. Accepting that James learned about the Second Charitable Proviso when Alice died in 2002, there was no reason for him to file suit at that time. James has never contended the that the 1986 Exercise was invalid, so he did not have any reason to challenge the validity of that instrument. He also did not have cause to target the Second Charitable Proviso. As this decision has explained, Phyllis did not need to rely on that provision. She could have adopted children and exercised the Second Limited Power without reference to the Second Charitable Proviso, or she could have chosen not to exercise the Second Limited Power at all. It was also possible, as demonstrated by the later adoption of the Appointee Expansion Statute, that the law could change such that Phyllis would be able to rely on the Second Charitable Proviso.

The Foundation and the Executor allege in wholly conclusory fashion that James knew or should have known that Phyllis executed the 2006 Exercise in reliance on the Second Charitable Proviso, at which point they say he should have filed suit. The party asserting an affirmative defense must support the defense with pled facts. *Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2021 WL 2182828, at *1, *5 (Del. Ch. May 28, 2021) (collecting authorities). Knowledge can be pled generally, but there still must be some factual content to support a reasonable inference of knowledge. The Foundation and

35

the Executor provided nothing to support their conclusory allegation. It also remains true that even if James suspected that Phyllis had relied on the Second Charitable Proviso, she could have changed her dispositive scheme at any point up to her death, or the law could have changed to make her reliance on the Second Charitable Proviso permissible.

James raised his concerns promptly after Phyllis's death. The Trustee responded by filing this suit. It is not reasonably conceivable that James could be denied relief based on the defense of laches. That is particularly so when the central issue involves the validity of an instrument where the outcome turns on the plain language of the Trust Agreement and longstanding principles of law. To rely on laches to bar James' claim would permit Phyllis to contravene the settlor's intent.

**D.      The Claim of Breach of Fiduciary Duty.**

The Executor claims that the Trustee breached its fiduciary duty as a trustee by failing to raise any issue about the potential invalidity of the 1986 Exercise or the 2006 Exercise. Whether the Executor has a claim against the Trustee does not affect the validity of either exercise or the court's ability to grant judgment on the pleadings on the issue of their validity. This decision does not express any view on the issue of a breach of fiduciary duty, except to observe that it does not affect the questions addressed in this opinion.

## III.      CONCLUSION

The 1986 Exercise was effective. The 2006 Exercise, however, was ineffective because Phyllis sought to appoint the Phyllis Trust to an appointee that Felix had not contemplated within the scope of the Original Limited Power. The Final Default Provision in the 1986 Exercise controls the disposition of the Phyllis Trust. The Trustee will distribute

36

the Phyllis Trust outright to James and Mary. The parties will submit an implementing order that has been agreed upon as to form.